# BOARD OF CURATORS OF THE UNIVERSITY OF MISSOURI ET AL. *v.* HOROWITZ

No. 76–695.   Argued November 7, 1977—Decided March 1, 1978

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, POWELL, and STEVENS, JJ., joined, and in Parts I, II–A, and III of which WHITE, J., joined. POWELL, J., filed a concurring opinion, *post,* p. 92. WHITE, J., filed an opinion concurring in part and concurring in the judgment, *post,* p. 96. MARSHALL, J., filed an opinion concurring in part and dissenting in part, *post,* p. 97. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN, J., joined, *post,* p. 108.

*Marvin E. Wright* argued the cause for petitioners. With him on the brief were *Jackson A. Wright* and *Fred Wilkins.*

*Arthur A. Benson II* argued the cause and filed a brief for respondent.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent, a student at the University of Missouri-Kansas City Medical School, was dismissed by petitioner officials of the school during her final year of study for failure to meet academic standards. Respondent sued petitioners under 42

---

*\*Joel M. Gora* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

U. S. C. § 1983 in the United States District Court for the Western District of Missouri alleging, among other constitutional violations, that petitioners had not accorded her procedural due process prior to her dismissal. The District Court, after conducting a full trial, concluded that respondent had been afforded all of the rights guaranteed her by the Fourteenth Amendment to the United States Constitution and dismissed her complaint. The Court of Appeals for the Eighth Circuit reversed, 538 F. 2d 1317 (1976), and a petition for rehearing en banc was denied by a divided court. 542 F. 2d 1335 (1976). We granted certiorari, 430 U. S. 964, to consider what procedures must be accorded to a student at a state educational institution whose dismissal may constitute a deprivation of "liberty" or "property" within the meaning of the Fourteenth Amendment. We reverse the judgment of the Court of Appeals.

I

Respondent was admitted with advanced standing to the Medical School in the fall of 1971. During the final years of a student's education at the school, the student is required to pursue in "rotational units" academic and clinical studies pertaining to various medical disciplines such as obstetrics-gynecology, pediatrics, and surgery. Each student's academic performance at the School is evaluated on a periodic basis by the Council on Evaluation, a body composed of both faculty and students, which can recommend various actions including probation and dismissal. The recommendations of the Council are reviewed by the Coordinating Committee, a body composed solely of faculty members, and must ultimately be approved by the Dean. Students are not typically allowed to appear before either the Council or the Coordinating Committee on the occasion of their review of the student's academic performance.

In the spring of respondent's first year of study, several faculty members expressed dissatisfaction with her clinical

performance during a pediatrics rotation. The faculty members noted that respondent's "performance was below that of her peers in all clinical patient-oriented settings," that she was erratic in her attendance at clinical sessions, and that she lacked a critical concern for personal hygiene. Upon the recommendation of the Council on Evaluation, respondent was advanced to her second and final year on a probationary basis.

Faculty dissatisfaction with respondent's clinical performance continued during the following year. For example, respondent's docent, or faculty adviser, rated her clinical skills as "unsatisfactory." In the middle of the year, the Council again reviewed respondent's academic progress and concluded that respondent should not be considered for graduation in June of that year; furthermore, the Council recommended that, absent "radical improvement," respondent be dropped from the school.

Respondent was permitted to take a set of oral and practical examinations as an "appeal" of the decision not to permit her to graduate. Pursuant to this "appeal," respondent spent a substantial portion of time with seven practicing physicians in the area who enjoyed a good reputation among their peers. The physicians were asked to recommend whether respondent should be allowed to graduate on schedule and, if not, whether she should be dropped immediately or allowed to remain on probation. Only two of the doctors recommended that respondent be graduated on schedule. Of the other five, two recommended that she be immediately dropped from the school. The remaining three recommended that she not be allowed to graduate in June and be continued on probation pending further reports on her clinical progress. Upon receipt of these recommendations, the Council on Evaluation reaffirmed its prior position.

The Council met again in mid-May to consider whether respondent should be allowed to remain in school beyond June

of that year. Noting that the report on respondent's recent surgery rotation rated her performance as "low-satisfactory," the Council unanimously recommended that "barring receipt of any reports that Miss Horowitz has improved radically, [she] not be allowed to re-enroll in the . . . School of Medicine." The Council delayed making its recommendation official until receiving reports on other rotations; when a report on respondent's emergency rotation also turned out to be negative, the Council unanimously reaffirmed its recommendation that respondent be dropped from the school. The Coordinating Committee and the Dean approved the recommendation and notified respondent, who appealed the decision in writing to the University's Provost for Health Sciences. The Provost sustained the school's actions after reviewing the record compiled during the earlier proceedings.

## II

### A

To be entitled to the procedural protections of the Fourteenth Amendment, respondent must in a case such as this demonstrate that her dismissal from the school deprived her of either a "liberty" or a "property" interest. Respondent has never alleged that she was deprived of a property interest. Because property interests are creatures of state law, *Perry* v. *Sindermann,* 408 U. S. 593, 599–603 (1972), respondent would have been required to show at trial that her seat at the Medical School was a "property" interest recognized by Missouri state law. Instead, respondent argued that her dismissal deprived her of "liberty" by substantially impairing her opportunities to continue her medical education or to return to employment in a medically related field.

The Court of Appeals agreed, citing this Court's opinion in *Board of Regents* v. *Roth,* 408 U. S. 564 (1972).[1] In that case,

---

[1] Respondent concedes that petitioners have not "invoke[d] any regulations to bar" her from seeking out employment in the medical

we held that the State had not deprived a teacher of any liberty or property interest in dismissing the teacher from a nontenured position, but noted:

"[T]here is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. The State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities." *Id.*, at 573.

We have recently had an opportunity to elaborate upon the circumstances under which an employment termination might infringe a protected liberty interest. In *Bishop* v. *Wood*, 426 U. S. 341 (1976), we upheld the dismissal of a policeman without a hearing; we rejected the theory that the mere fact of dismissal, absent some publicizing of the reasons for the action, could amount to a stigma infringing one's liberty:

"In *Board of Regents* v. *Roth*, 408 U. S. 564, we recognized that the nonretention of an untenured college teacher might make him somewhat less attractive to other employers, but nevertheless concluded that it would

---

field or from finishing her medical education at a different institution. Brief for Respondent 21. Cf. *Board of Regents* v. *Roth*, 408 U. S., at 573. Indeed, the Coordinating Committee in accepting the recommendation of the Council that respondent be dismissed, noted that "as with all students, should sufficient improvement take place, she could be considered for readmission to the School of Medicine." The Court of Appeals, however, relied on the testimony of a doctor employed by the Kansas City Veterans' Administration to the effect that respondent's dismissal would be "a significant black mark." On the Medical School side, it was the doctor's view that respondent "would have great difficulty to get into another medical school, if at all." As for employment, if two people were applying for a position with the Veterans' Administration with "otherwise . . . equal qualifications, roughly, I would lean heavily to the other person who was not dismissed from a graduate school." 538 F. 2d 1317, 1320–1321, n. 3 (1976).

84

stretch the concept too far 'to suggest that a person is deprived of "liberty" when he simply is not rehired in one job but remains as free as before to seek another.' *Id.,* at 575. This same conclusion applies to the discharge of a public employee whose position is terminable at the will of the employer when there is no public disclosure of the reasons for the discharge.

"In this case the asserted reasons for the City Manager's decision were communicated orally to the petitioner in private and also were stated in writing in answer to interrogatories after this litigation commenced. Since the former communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his 'good name, reputation, honor, or integrity' was thereby impaired." *Id.,* at 348 (footnote omitted).

The opinion of the Court of Appeals, decided only five weeks after we issued our opinion in *Bishop,* does not discuss whether a state university infringes a liberty interest when it dismisses a student without publicizing allegations harmful to the student's reputation. Three judges of the Court of Appeals for the Eighth Circuit dissented from the denial of rehearing en banc on the ground that "the reasons for Horowitz's dismissal were not released to the public but were communicated to her directly by school officials." Citing *Bishop,* the judges concluded that "[a]bsent such public disclosure, there is no deprivation of a liberty interest." 542 F. 2d, at 1335. Petitioners urge us to adopt the view of these judges and hold that respondent has not been deprived of a liberty interest.

B

We need not decide, however, whether respondent's dismissal deprived her of a liberty interest in pursuing a medical career. Nor need we decide whether respondent's dismissal infringed any other interest constitutionally protected against deprivation without procedural due process. Assuming the

existence of a liberty or property interest, respondent has been awarded at least as much due process as the Fourteenth Amendment requires. The school fully informed respondent of the faculty's dissatisfaction with her clinical progress and the danger that this posed to timely graduation and continued enrollment. The ultimate decision to dismiss respondent was careful and deliberate. These procedures were sufficient under the Due Process Clause of the Fourteenth Amendment. We agree with the District Court that respondent

> "was afforded full procedural due process by the [school]. In fact, the Court is of the opinion, and so finds, that the school went beyond [constitutionally required] procedural due process by affording [respondent] the opportunity to be examined by seven independent physicians in order to be absolutely certain that their grading of the [respondent] in her medical skills was correct." App. 47.

In *Goss* v. *Lopez,* 419 U. S. 565 (1975), we held that due process requires, in connection with the suspension of a student from public school for disciplinary reasons, "that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.,* at 581. The Court of Appeals apparently read *Goss* as requiring some type of formal hearing at which respondent could defend her academic ability and performance.[2] All

---

[2] The Court of Appeals held without elaboration that the dismissal had been "effected without the hearing required by the fourteenth amendment." 538 F. 2d, at 1321. No express indication was given as to what the minimum requirements of such a hearing would be. One can assume, however, that the contours of the hearing would be much the same as those set forth in *Greenhill* v. *Bailey,* 519 F. 2d 5 (CA8 1975), which also involved an academic dismissal and upon which the Court of Appeals principally relied. *Greenhill* held that the student must be "accorded an opportunity to appear personally to contest [the allegations of academic deficiency]. We stop short, however, of requiring full trial-type procedures in such situations. A graduate or professional school is, after all,

that *Goss* required was an "informal give-and-take" between the student and the administrative body dismissing him that would, at least, give the student "the opportunity to characterize his conduct and put it in what he deems the proper context." *Id.*, at 584. But we have frequently emphasized that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers* v. *McElroy*, 367 U. S. 886, 895 (1961). The need for flexibility is well illustrated by the significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct. This difference calls for far less stringent procedural requirements in the case of an academic dismissal.[3]

---

the best judge of its students' academic performance and their ability to master the required curriculum. The presence of attorneys or the imposition of rigid rules of cross-examination at a hearing for a student . . . would serve no useful purpose, notwithstanding that the dismissal in question may be of permanent duration. But an 'informal give-and-take' between the student and the administrative body dismissing him . . . would not unduly burden the educational process and would, at least, give the student 'the opportunity to characterize his conduct and put it in what he deems the proper context.' " *Id.*, at 9 (footnote omitted), quoting *Goss* v. *Lopez*, 419 U. S., at 584. Respondent urges us to go even further than the Court of Appeals and require "the fundamental safeguards of representation by counsel, confrontation, and cross-examination of witnesses." Brief for Respondent 36.

[3] We fully recognize that the deprivation to which respondent was subjected—dismissal from a graduate medical school—was more severe than the 10-day suspension to which the high school students were subjected in *Goss*. And a relevant factor in determining the nature of the requisite due process is "the private interest that [was] affected by the official action." *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976). But the severity of the deprivation is only one of several factors that must be weighed in deciding the exact due process owed. *Ibid.* We conclude that considering all relevant factors, including the evaluative nature of the inquiry and the significant and historically supported interest of the school in preserving its present framework for academic evaluations, a hearing is not required by the Due Process Clause of the Fourteenth Amendment.

Since the issue first arose 50 years ago, state and lower federal courts have recognized that there are distinct differences between decisions to suspend or dismiss a student for disciplinary purposes and similar actions taken for academic reasons which may call for hearings in connection with the former but not the latter. Thus, in *Barnard* v. *Inhabitants of Shelburne*, 216 Mass. 19, 102 N. E. 1095 (1913), the Supreme Judicial Court of Massachusetts rejected an argument, based on several earlier decisions requiring a hearing in disciplinary contexts, that school officials must also grant a hearing before excluding a student on academic grounds. According to the court, disciplinary cases have

> "no application. . . . Misconduct is a very different matter from failure to attain a standard of excellence in studies. A determination as to the fact involves investigation of a quite different kind. A public hearing may be regarded as helpful to the ascertainment of misconduct and useless or harmful in finding out the truth as to scholarship." *Id.,* at 22–23, 102 N. E., at 1097.

A similar conclusion has been reached by the other state courts to consider the issue. See, *e. g., Mustell* v. *Rose,* 282 Ala. 358, 367, 211 So. 2d 489, 498, cert. denied, 393 U. S. 936 (1968); cf. *Foley* v. *Benedict,* 122 Tex. 193, 55 S. W. 2d 805 (1932). Indeed, until the instant decision by the Court of Appeals for the Eighth Circuit, the Courts of Appeals were also unanimous in concluding that dismissals for academic (as opposed to disciplinary) cause do not necessitate a hearing before the school's decisionmaking body. See *Mahavongsanan* v. *Hall,* 529 F. 2d 448 (CA5 1976); [4] *Gaspar* v. *Bruton,* 513

---

[4] "The district court's grant of relief is based on a confusion of the court's power to review *disciplinary* actions by educational institutions on the one hand, and *academic* decisions on the other hand. This Court has been in the vanguard of the legal development of due process protections for students ever since *Dixon* v. *Alabama State Board of Education,* 5 Cir. 1961, 294 F. 2d 150, *cert. denied* 1961, 368 U. S. 930 . . . . However,

88

F. 2d 843 (CA10 1975).[5]  These prior decisions of state and federal courts, over a period of 60 years, unanimously holding that formal hearings before decisionmaking bodies need not be held in the case of academic dismissals, cannot be rejected lightly.  Cf. *Snyder* v. *Massachusetts*, 291 U. S. 97, 118–119, 131–132 (1934); *Powell* v. *Alabama*, 287 U. S. 45, 69–71 (1932); *Jackman* v. *Rosenbaum Co.*, 260 U. S. 22, 31 (1922).

Reason, furthermore, clearly supports the perception of these decisions.  A school is an academic institution, not a courtroom or administrative hearing room.  In *Goss*, this Court felt that suspensions of students for disciplinary reasons have a sufficient resemblance to traditional judicial and ad-

the due process requirements of notice and hearing developed in the *Dixon* line of cases have been carefully limited to disciplinary decisions. When we explained that 'the student at the tax supported institution cannot be arbitrarily disciplined without the benefit of the ordinary, well recognized principles of fair play', we went on to declare that '[w]e know of no case which holds that colleges and universities are subject to the supervision or review of the courts in the uniform application of their academic standards.  Indeed, *Dixon* infers to the contrary.'  *Wright* v. *Texas Southern University*, 5 Cir. 1968, 392 F. 2d 728, 729.  Misconduct and failure to attain a standard of scholarship cannot be equated.  A hearing may be required to determine charges of misconduct, but a hearing may be useless or harmful in finding out the truth concerning scholarship.  There is a clear dichotomy between a student's due process rights in disciplinary dismissals and in academic dismissals."  529 F. 2d, at 449–450.

[5] In *Greenhill* v. *Bailey, supra,* the Court of Appeals held that a hearing had been necessary where a medical school not only dismissed a student for academic reasons but also sent a letter to the Liaison Committee of the Association of the American Medical Colleges suggesting that the student either lacked "intellectual ability" or had insufficiently prepared his course work.  The court specifically noted that "there has long been a distinction between cases concerning disciplinary dismissals, on the one hand, and academic dismissals, on the other" and emphasized that it did not wish to "blur that distinction."  519 F. 2d, at 8.  In the court's opinion, the publicizing of an alleged deficiency in the student's intellectual ability removed the case from the typical instance of academic dismissal and called for greater procedural protections.  Cf. *Bishop* v. *Wood*, 426 U. S. 341 (1976).

ministrative factfinding to call for a "hearing" before the relevant school authority. While recognizing that school authorities must be afforded the necessary tools to maintain discipline, the Court concluded:

> "[I]t would be a strange disciplinary system in an educational institution if no communication was sought by the disciplinarian with the student in an effort to inform him of his dereliction and to let him tell his side of the story in order to make sure that an injustice is not done.

> .          .          .          .          .

> "[R]equiring effective notice and informal hearing permitting the student to give his version of the events will provide a meaningful hedge against erroneous action. At least the disciplinarian will be alerted to the existence of disputes about facts and arguments about cause and effect." 419 U. S., at 580, 583–584.

Even in the context of a school disciplinary proceeding, however, the Court stopped short of requiring a *formal* hearing since "further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as a part of the teaching process." *Id.*, at 583.

Academic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative factfinding proceedings to which we have traditionally attached a full-hearing requirement. In *Goss*, the school's decision to suspend the students rested on factual conclusions that the individual students had participated in demonstrations that had disrupted classes, attacked a police officer, or caused physical damage to school property. The requirement of a hearing, where the student could present his side of the factual issue, could under such circumstances "provide a meaningful hedge against erroneous action." *Ibid.* The decision to dismiss respondent, by comparison, rested on the academic judgment of school officials that she did not have

the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal. Such a judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision. Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of·judicial or administrative decisionmaking.

Under such circumstances, we decline to ignore the historic judgment of .educators and thereby formalize the academic dismissal process by requiring a hearing. The educational process is not by nature adversary; instead it centers around a continuing relationship between faculty and students, "one in which the teacher must occupy many roles—educator, adviser, friend, and, at times, parent-substitute." *Goss* v. *Lopez,* 419 U. S., at 594 (POWELL, J., dissenting). This is especially true as one advances through the varying regimes of the educational system, and the instruction becomes both more individualized and more specialized. In *Goss,* this Court concluded that the value of some form of hearing in a disciplinary context outweighs any resulting harm to the academic environment. Influencing this conclusion was clearly the belief that disciplinary proceedings, in which the teacher must decide whether to punish a student for disruptive or insubordinate behavior, may automatically bring an adversary flavor to the normal student-teacher relationship. The same conclusion does not follow in the academic context. We decline to further enlarge the judicial presence in the academic community and thereby risk deterioration of many beneficial aspects of the faculty-student relationship. We recognize, as did the Massachusetts Supreme Judicial Court over 60 years ago, that a hearing may be "useless or harmful in finding out the truth as to scholarship." *Barnard* v. *Inhabitants of Shelburne,* 216 Mass., at 23, 102 N. E., at 1097.

"Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. . . . By and large, public education in our Nation is committed to the control of state and local authorities." *Epperson* v. *Arkansas*, 393 U. S. 97, 104 (1968). We see no reason to intrude on that historic control in this case.[6]

## III

In reversing the District Court on procedural due process grounds, the Court of Appeals expressly failed to "reach the substantive due process ground advanced by Horowitz." 538 F. 2d, at 1321 n. 5. Respondent urges that we remand the cause to the Court of Appeals for consideration of this additional claim. In this regard, a number of lower courts have implied in dictum that academic dismissals from state institutions can be enjoined if "shown to be clearly arbitrary or capricious." *Mahavongsanan* v. *Hall*, 529 F. 2d, at 449. See *Gaspar* v. *Bruton*, 513 F. 2d, at 850, and citations therein. Even assuming that the courts can review under such a standard an academic decision of a public educational

---

[6] Respondent contends in passing that she was not dismissed because of "clinical incompetence," an academic inquiry, but for disciplinary reasons similar to those involved in *Goss*. Thus, as in *Goss*, a hearing must be conducted. In this regard, respondent notes that the school warned her that significant improvement was needed not only in the area of clinical performance but also in her personal hygiene and in keeping to her clinical schedules. The record, however, leaves no doubt that respondent was dismissed for purely academic reasons, a fact assumed without discussion by the lower courts. Personal hygiene and timeliness may be as important factors in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness. Questions of personal hygiene and timeliness, of course, may seem more analogous to traditional factfinding than other inquiries that a school may make in academically evaluating a student. But in so evaluating the student, the school considers and weighs a variety of factors, not all of which, as noted earlier, are adaptable to the factfinding hearing. And the critical faculty-student relationship may still be injured if a hearing is required.

institution, we agree with the District Court that no showing of arbitrariness or capriciousness has been made in this case.[7] Courts are particularly ill-equipped to evaluate academic performance. The factors discussed in Part II with respect to procedural due process speak *a fortiori* here and warn against any such judicial intrusion into academic decisionmaking.[8]

The judgment of the Court of Appeals is therefore

*Reversed.*

MR. JUSTICE POWELL, concurring.

I join the Court's opinion because I read it as upholding the District Court's view that respondent was dismissed for academic deficiencies rather than for unsatisfactory personal

---

[7] Respondent alleges that the school applied more stringent standards in evaluating her performance than that of other students because of her sex, religion, and physical appearance. The District Court, however, found: "There was no evidence that [respondent] was in any manner evaluated differently from other students because of her sex or because of her religion. With regard to [respondent's] physical appearance, this in and of itself did not cause [her] to be evaluated any differently than any of the other students." App. 45.

[8] Respondent also contends that petitioners failed to follow their own rules respecting evaluation of medical students and that this failure amounted to a constitutional violation under *Service* v. *Dulles,* 354 U. S. 363 (1957). We disagree with both respondent's factual and legal contentions. As for the facts, the record clearly shows that the school followed its established rules, except where new rules had to be designed in an effort to further protect respondent, as with the practical "appeal" that petitioners allowed respondent to take. The District Court specifically found that "the progress status of [respondent] in the medical school was evaluated in a manner similar to and consistent with the evaluation of other similarly situated students, with the exception that [respondent's] docent . . . went to even greater lengths to assist [respondent] in an effort for her to obtain her M. D. degree, than he did for any of his other students." App. 45. As for the legal conclusion that respondent draws, both *Service* and *Accardi* v. *Shaughnessy,* 347 U. S. 260 (1954), upon which *Service* relied, enunciate principles of federal administrative law rather than of constitutional law binding upon the States.

conduct, and that in these circumstances she was accorded due process.

In the numerous meetings and discussions respondent had with her teachers and advisers, see opinion of MR. JUSTICE MARSHALL, *post,* at 98–99, culminating in the special clinical examination administered by seven physicians,[1] *ante,* at 81, respondent was warned of her clinical deficiencies and given every opportunity to demonstrate improvement or question the evaluations. The primary focus of these discussions and examinations was on respondent's competence as a physician.

MR. JUSTICE MARSHALL nevertheless states that respondent's dismissal was based "largely" on "her conduct":

"It may nevertheless be true, as the Court implies, *ante,* at 91 n. 6, that the school decided that respondent's inadequacies in such areas as personal hygiene, peer and patient relations, and timeliness would impair her ability to be 'a good medical doctor.' Whether these inadequacies can be termed 'purely academic reasons,' as the Court calls them, *ibid.,* is ultimately an irrelevant question, and one placing an undue emphasis on words rather than functional considerations. *The relevant point is that*

---

[1] As a safeguard against erroneous judgment, and at respondent's request, App. 185, the Medical School submitted the question of respondent's clinical competency to a panel of "seven experienced physicians." Panel members were requested "to provide a careful, detailed, and thorough assessment of [respondent's] abilities at this time." *Ibid.* The Dean's letter to respondent of March 15, 1973, advised her quite specifically of the "general topic[s] in the curriculum about which we are asking [the panel] to evaluate your performance . . . ." *Ibid.* Each member of the examining panel was requested to "evaluate the extent of [respondent's] mastery of relevant concepts, knowledge, skills, and competence to function as a physician." *Id.,* at 209. The examinations by members of the panel were conducted separately. Two of the doctors recommended that respondent be graduated although one added that "she would not qualify to intern at the hospital where he worked." *Id.,* at 40. Each of the other five doctors submitted negative recommendations, although they varied as to whether respondent should be dropped from school immediately. *Ibid.*

*respondent was dismissed largely because of her conduct, just as the students in Goss were suspended because of their conduct." Post,* at 104 (emphasis added; footnotes omitted).

This conclusion is explicitly contrary to the District Court's undisturbed findings of fact. In one sense, the term "conduct" could be used to embrace a poor academic performance as well as unsatisfactory personal conduct. But I do not understand MR. JUSTICE MARSHALL to use the term in that undifferentiated sense.[2] His opinion likens the dismissal of respondent to the suspension of the students in *Goss* v. *Lopez,* 419 U. S. 565 (1975), for personal misbehavior. There is evidence that respondent's personal conduct may have been viewed as eccentric, but—quite unlike the suspensions in *Goss*—respondent's dismissal was not based on her personal behavior.

The findings of the District Court conclusively show that respondent was dismissed for failure to meet the academic standards of the Medical School. The court, after reviewing the evidence in some detail, concluded:

"The evidence presented in this case totally failed to

---

[2] Indeed, in view of MR. JUSTICE MARSHALL's apparent conclusion that respondent was dismissed because of some objectively determinable conduct, it is difficult to understand his conclusion that the special examination administered by the seven practicing physicians "may have been better than . . . a formal hearing." *Post,* at 102. That examination did not purport to determine whether, in the past, respondent had engaged in conduct that would warrant dismissal. Respondent apparently was not called upon to argue that she had not done certain things in the past. There were no facts found on that point. Nor did the doctors who administered the examination address themselves to respondent's conduct at the time, *apart from her ability to perform the clinical tasks physicians must master.* MR. JUSTICE MARSHALL says that this evaluation tested the truth of the assertions that respondent could not function as a doctor. *Post,* at 102–103, n. 14. This is a tacit recognition that the issue was an academic one, rather than one limited to whether respondent simply engaged in improper conduct.

establish that plaintiff [respondent] was expelled for any reason other than the quality of her work." App. 44.[3]

It is well to bear in mind that respondent was attending a medical school where competence in clinical courses is as much of a prerequisite to graduation as satisfactory grades in other courses. Respondent was dismissed because she was as deficient in her clinical work as she was proficient in the "book-learning" portion of the curriculum.[4] Evaluation of her performance in the former area is no less an "academic" judgment because it involves observation of her skills and techniques in actual conditions of practice, rather than assigning a grade to her written answers on an essay question.[5]

---

[3] The District Court also found:

"Considering all of the evidence presented, the Court finds that the grading and evaluating system of the medical school was applied fairly and reasonably to plaintiff, but plaintiff did not satisfy the requirements of the medical school to graduate from the medical school in June 1973." App. 45.

[4] Dr. William Sirridge was the faculty member assigned to respondent as her "chief docent" (faculty adviser). A portion of his testimony was summarized by the District Court as follows:

"He [Dr. Sirridge] emphasized that plaintiff's [respondent's] problem was that she thought she could learn to be a medical doctor by reading books, and he advised her [that] the clinical skills were equally as important for obtaining the M. D. degree. He further testified that plaintiff cannot perform many of the necessary basic skills required of a practicing physician . . . ." Id., at 35.

[5] MR. JUSTICE MARSHALL insists that calling this an academic judgment is an exercise in futility. Post, at 104–105, n. 18. As the Court points out, however, the distinction between dismissal for academic deficiency and dismissal for misconduct may be decisive as to the process that is due. Ante, at 89–90. A decision relating to the misconduct of a student requires a factual determination as to whether the conduct took place or not. The accuracy of that determination can be safeguarded by the sorts of procedural protections traditionally imposed under the Due Process Clause. An academic judgment also involves this type of objectively determinable fact—e. g., whether the student gave certain answers on an examination. But the critical decision requires a subjective, expert evaluation as to

Because it is clear from the findings of fact by the District Court that respondent was dismissed solely on academic grounds, and because the standards of procedural due process were abundantly met before dismissal occurred,[6] I join the Court's opinion.

MR. JUSTICE WHITE, concurring in part and concurring in the judgment.

I join Parts I, II–A, and III of the Court's opinion and concur in the judgment.

I agree with my Brother BLACKMUN that it is unnecessary to decide whether respondent had a constitutionally protected property or liberty interest or precisely what minimum procedures were required to divest her of that interest if it is assumed she had one. Whatever that minimum is, the procedures accorded her satisfied or exceeded that minimum.

The Court nevertheless assumes the existence of a protected interest, proceeds to classify respondent's expulsion as an "academic dismissal," and concludes that no hearing of any kind or any opportunity to respond is required in connection with such an action. Because I disagree with this conclusion,

---

whether that performance satisfies some predetermined standard of academic competence. That standard, in turn, is set by a similarly expert judgment. These evaluations, which go far beyond questions of mere "conduct," are not susceptible of the same sorts of procedural safeguards that are appropriate to determining facts relating to misconduct. Thus, the conclusion that a particular dismissal is academic—that it entails these expert evaluations—is likely to have controlling significance in determining how much and what sort of process is due.

[6] University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation. Contrary to the suggestion of MR. JUSTICE MARSHALL, post, at 104–105, n. 18, the fact that a particular procedure is possible or available does not mean that it is required under the Due Process Clause. Goss v. Lopez, 419 U. S. 565 (1975), simply does not speak to that point.

I feel constrained to say so and to concur only in the judgment.

As I see it, assuming a protected interest, respondent was at the minimum entitled to be informed of the reasons for her dismissal and to an opportunity personally to state her side of the story. Of course, she had all this, and more. I also suspect that expelled graduate or college students normally have the opportunity to talk with their expellers and that this sort of minimum requirement will impose no burden that is not already being shouldered and discharged by responsible institutions.

MR. JUSTICE MARSHALL, concurring in part and dissenting in part.

I agree with the Court that, "[a]ssuming the existence of a liberty or property interest, respondent has been awarded at least as much due process as the Fourteenth Amendment requires." *Ante,* at 84–85. I cannot join the Court's opinion, however, because it contains dictum suggesting that respondent was entitled to even less procedural protection than she received. I also differ from the Court in its assumption that characterization of the reasons for a dismissal as "academic" or "disciplinary" is relevant to resolution of the question of what procedures are required by the Due Process Clause. Finally, I disagree with the Court's decision not to remand to the Court of Appeals for consideration of respondent's substantive due process claim.

## I

We held in *Goss* v. *Lopez,* 419 U. S. 565 (1975), that

> "due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.,* at 581.

There is no question that respondent received these protections, and more.[1]

According to the stipulation of facts filed in the District Court, respondent had a "discussion" with the Dean of the Medical School in mid-1972, at the close of her first year in school, during which she was notified of her unsatisfactory performance.[2] The Dean testified that he explained the nature of her problems to respondent twice at this meeting, so that she would fully understand them.[3] A letter from the Dean followed shortly thereafter, in which respondent was advised that she was being placed on probation because of, *inter alia,* "a major deficiency" in her "relationships with others," and her failure to "kee[p] to established schedules" and "atten[d] carefully to personal appearance."[4] The Dean again met with respondent in October 1972 "to call attention in a direct and supportive way to the fact that her performance was not then strong."[5]

In January 1973, there was still another meeting between respondent and the Dean, who was accompanied by respondent's docent and the chairman of the Council on Evaluation. Respondent was there notified of the Council's recommendation that she not graduate and that she be dropped from school unless there was "radical improvement" in her "clinical competence, peer and patient relations, personal hygiene, and ability to accept criticism."[6] A letter from the Dean again

---

[1] It is necessary to recount the facts underlying this conclusion in some detail, because the Court's opinion does not provide the relevant facts with regard to the notice and opportunity to reply given to respondent.

[2] App. 15. It is likely that respondent was less formally notified of these deficiencies several months earlier, in March 1972. See *id.,* at 100–101 (testimony of respondent's docent).

[3] *Id.,* at 146.

[4] *Id.,* at 15–16.

[5] *Id.,* at 147.

[6] *Id.,* at 18.

followed the meeting; the letter summarized respondent's problem areas and noted that they had been discussed with her "several times." [7]

These meetings and letters plainly gave respondent all that *Goss* requires: several notices and explanations, and at least three opportunities "to present [her] side of the story." 419 U. S., at 581. I do not read the Court's opinion to disagree with this conclusion. Hence I do not understand why the Court indicates that even the "informal give-and-take" mandated by *Goss, id.,* at 584, need not have been provided here. See *ante,* at 85–86, 89–91. This case simply provides no legitimate opportunity to consider whether "far less stringent procedural requirements," *ante,* at 86, than those required in *Goss* are appropriate in other school contexts. While I disagree with the Court's conclusion that "far less" is adequate, as discussed *infra,* it is equally disturbing that the Court decides an issue not presented by the case before us. As Mr. Justice Brandeis warned over 40 years ago, the " 'great gravity and delicacy' " of our task in constitutional cases should cause us to " 'shrink' " from " 'anticipat[ing] a question of constitutional law in advance of the necessity of deciding it,' " and from " 'formulat[ing] a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' " *Ashwander* v. *TVA,* 297 U. S. 288, 345–347 (1936) (concurring opinion).

## II

In view of the Court's dictum to the effect that even the minimum procedures required in *Goss* need not have been provided to respondent, I feel compelled to comment on the extent of procedural protection mandated here. I do so within a framework largely ignored by the Court, a framework derived from our traditional approach to these problems. According to our prior decisions, as summarized in *Mathews* v.

---

[7] *Id.,* at 182–183.

*Eldridge,* 424 U. S. 319 (1976), three factors are of principal relevance in determining what process is due:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.,* at 335.

As the Court recognizes, the "private interest" involved here is a weighty one: "the deprivation to which respondent was subjected—dismissal from a graduate medical school—was more severe than the 10-day suspension to which the high school students were subjected in *Goss." Ante,* at 86 n. 3. One example of the loss suffered by respondent is contained in the stipulation of facts: Respondent had a job offer from the psychiatry department of another university to begin work in September 1973; the offer was contingent on her receiving the M. D. degree.[8]  In summary, as the Court of Appeals noted:

> "The unrefuted evidence here establishes that Horowitz has been stigmatized by her dismissal in such a way that she will be unable to continue her medical education, and her chances of returning to employment in a medically related field are severely damaged." 538 F. 2d 1317, 1321 (CA8 1976).

As Judge Friendly has written in a related context, when the State seeks "to deprive a person of a way of life to which [s]he has devoted years of preparation and on which [s]he . . . ha[s] come to rely," it should be required first to provide a "high level of procedural protection." [9]

---

[8] *Id.,* at 16.

[9] "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267, 1296–1297 (1975) (revocation of professional licenses).

Neither of the other two factors mentioned in *Mathews* justifies moving from a high level to the lower level of protection involved in *Goss*. There was at least some risk of error inherent in the evidence on which the Dean relied in his meetings with and letters to respondent; faculty evaluations of such matters as personal hygiene and patient and peer rapport are neither as "sharply focused" nor as "easily documented" as was, *e. g.*, the disability determination involved in *Mathews, supra,* at 343. See *Goss* v. *Lopez,* 419 U. S., at 580 (when decisionmaker "act[s] on the reports and advice of others . . . [t]he risk of error is not at all trivial").[10]

Nor can it be said that the university had any greater interest in summary proceedings here than did the school in *Goss*. Certainly the allegedly disruptive and disobedient students involved there, see *id.*, at 569–571, posed more of an immediate threat to orderly school administration than did respondent. As we noted in *Goss,* moreover, "it disserves . . . the interest of the State if [the student's] suspension is in fact unwarranted." *Id.*, at 579.[11] Under these circumstances—with respondent having much more at stake than did the students in *Goss*, the administration at best having no more at stake, and the meetings between respondent and the Dean leaving some possibility of erroneous dismissal—I believe that respondent was entitled to more procedural protection than is provided by "informal give-and-take" before the school could dismiss her.

The contours of the additional procedural protection to which respondent was entitled need not be defined in terms of the traditional adversary system so familiar to lawyers and

---

[10] The inquiry about risk of error cannot be separated from the first inquiry about the private interest at stake. The more serious the consequences for the individual, the smaller the risk of error that will be acceptable.

[11] The statements and letters of the Medical School Dean reflect a genuine concern that respondent not be wrongfully dismissed. See App. 147–150, 180–183, 185–187.

judges. See *Mathews* v. *Eldridge,* 424 U. S., at 348. We have emphasized many times that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers* v. *McElroy,* 367 U. S. 886, 895 (1961); see, *e. g., ante,* at 86; *Goss* v. *Lopez, supra,* at 578. In other words, what process is due will vary "according to specific factual contexts." *Hannah* v. *Larche,* 363 U. S. 420, 442 (1960); see, *e. g., Mathews* v. *Eldridge, supra,* at 334; *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972); *Bell* v. *Burson,* 402 U. S. 535, 540 (1971). See also· *Anti-Fascist Comm.* v. *McGrath,* 341 U. S. 123, 162–163 (1951) (Frankfurter, J., concurring).

In the instant factual context the "appeal" provided to respondent, see *ante,* at 81, served the same purposes as, and in some respects may have been better than, a formal hearing. In establishing the procedure under which respondent was evaluated separately by seven physicians who had had little or no previous contact with her, it appears that the Medical School placed emphasis on obtaining "a fair and neutral and impartial assessment." [12] In order to evaluate respondent, each of the seven physicians spent approximately half a day observing her as she performed various clinical duties and then submitted a report on her performance to the Dean.[13] It is difficult to imagine a better procedure for determining whether the school's allegations against respondent had any substance to them.[14] Cf. *Mathews* v. *Eldridge, supra,* at

---

[12] *Id.,* at 150 (testimony of Dean); see *id.,* at 185, 187, 208, 210 (letters to respondent and seven physicians).

[13] See *id.,* at 190–207.

[14] Respondent appears to argue that her sex and her religion were under- lying reasons for her dismissal and that a hearing would have helped to resolve the "factual dispute" between her and the school on these issues. Brief for Respondent 30; see *id.,* at 51–52. See also *ante,* at 92 n. 7. But the only express grounds for respondent's dismissal related to deficien- cies in personal hygiene, patient rapport, and the like, and, as a matter of procedural due process, respondent was entitled to no more than a

337–338, 344 (use of independent physician to examine disability applicant and report to decisionmaker). I therefore believe that the appeal procedure utilized by respondent, together with her earlier notices from and meetings with the Dean, provided respondent with as much procedural protection as the Due Process Clause requires.[15]

## III

The analysis in Parts I and II of this opinion illustrates that resolution of this case under our traditional approach does not turn on whether the dismissal of respondent is characterized as one for "academic" or "disciplinary" reasons. In my view, the effort to apply such labels does little to advance the due process inquiry, as is indicated by examination of the facts of this case.

The minutes of the meeting at which it was first decided that respondent should not graduate contain the following:

> "This issue is *not one of academic achievement,* but of performance, relationship to people and ability to communicate." App. 218 (emphasis added).

By the customary measures of academic progress, moreover, no deficiency was apparent at the time that the authorities decided respondent could not graduate; prior to this time, according to the stipulation of facts, respondent had received

---

forum to contest the factual underpinnings of these grounds. The appeal procedure here gave respondent such a forum—an opportunity to demonstrate that the school's charges were "unfair or mistaken," *Goss* v. *Lopez,* 419 U. S. 565, 581 (1975).

[15] Like a hearing, the appeal procedure and the meetings

"represent[ed] . . . a valued human interaction in which the affected person experience[d] at least the satisfaction of participating in the decision that vitally concern[ed] her . . . . [T]hese rights to interchange express the elementary idea that to be a *person,* rather than a *thing,* is at least to be *consulted* about what is done with one." L. Tribe, American Constitutional Law § 10–7, p. 503 (1978) (emphasis in original).

"credit" and "satisfactory grades" in all of her courses, including clinical courses.[16]

It may nevertheless be true, as the Court implies, *ante,* at 91 n. 6, that the school decided that respondent's inadequacies in such areas as personal hygiene, peer and patient relations, and timeliness would impair her ability to be "a good medical doctor." Whether these inadequacies can be termed "purely academic reasons," as the Court calls them, *ibid.,* is ultimately an irrelevant question, and one placing an undue emphasis on words rather than functional considerations. The relevant point is that respondent was dismissed largely because of her conduct,[17] just as the students in *Goss* were suspended because of their conduct.[18]

---

[16] App. 12. Respondent later received "no credit" for her emergency-room rotation, the only course in which her grade was less than satisfactory. *Ibid.* This grade was not recorded, according to the District Court, until after the decision had been made that respondent could not graduate. *Id.,* at 31. When the Coordinating Committee made this decision, moreover, it apparently had not seen any evaluation of respondent's emergency-room performance. See *id.,* at 229 (minutes of Coordinating Committee meeting).

[17] Only one of the reasons voiced by the school for deciding not to graduate respondent had any arguable nonconduct aspects, and that reason, "clinical competence," was plainly related to perceived deficiencies in respondent's personal hygiene and relationships with colleagues and patients. See *id.,* at 219. See also *id.,* at 181, 182–183, 210.

[18] The futility of trying to draw a workable distinction between "academic" and "disciplinary" dismissals is further illustrated by my Brother POWELL's concurring opinion. The opinion states that the conclusion in the text *supra,* "is explicitly contrary to the District Court's undisturbed findings of fact," *ante,* at 94, but it cites no District Court finding indicating that respondent's dismissal was based on other than conduct-related considerations. No such finding exists.

The District Court's statement that respondent was dismissed because of " 'the quality of her work,' " quoted *ante,* at 95, like statements to the effect that the dismissal was "solely on academic grounds," *ante,* at 96, is ultimately irrelevant to the due process inquiry. It provides no information on the critical question whether "the facts disputed are of a type susceptible of determination by third parties." *Infra,* at 106. Nor does

The Court makes much of decisions from state and lower federal courts to support its point that "dismissals for academic . . . cause do not necessitate a hearing." *Ante,* at 87. The decisions on which the Court relies, however, plainly use the term "academic" in a much narrower sense than does the Court, distinguishing "academic" dismissals from ones based on "misconduct" and holding that, when a student is dismissed for failing grades, a hearing would serve no purpose.[19] These cases may be viewed as consistent with

---

the District Court's finding that " 'the grading and evaluating system of the medical school was applied fairly,' " quoted *ante,* at 95 n. 3, advance resolution of this case, especially in view of the fact, noted *supra,* that respondent's grades in clinical courses, as in all other courses, were satisfactory when the decision was made that she could not graduate. This fact further indicates, contrary to MR. JUSTICE POWELL's intimation, *ante,* at 95, that the school found the deficiencies in respondent's clinical performance to be different from the deficiencies that lead to unsatisfactory grades in more traditional scholastic subjects.

MR. JUSTICE POWELL is correct, of course, in suggesting that the kind of conduct here involved is different from that involved in *Goss* v. *Lopez, supra. Ante,* at 94, and n. 2. The question facing the Medical School authorities was not solely whether respondent had misbehaved in the past, but rather whether her past, present, and likely future conduct indicated that she would not be "a good medical doctor," *ante,* at 91 n. 6. The appeal procedure of the school was well suited to aid in resolution of this question, since it involved "observation of her skills and techniques in actual conditions of practice," *ante,* at 95. It matters not at all whether the result of such observation is labeled "an 'academic' judgment," *ibid.,* so long as it is recognized that the school authorities, having an efficient procedure available to determine whether their decision to dismiss respondent was "unfair or mistaken," *Goss* v. *Lopez, supra,* at 581, were constitutionally required to give respondent a chance to invoke the procedure, as they did, before depriving her of a substantial liberty or property interest. See *supra,* at 100–102.

[19] See *Mahavongsanan* v. *Hall,* 529 F. 2d 448, 450 (CA5 1976); *Gaspar* v. *Bruton,* 513 F. 2d 843, 849–851 (CA10 1975); *Mustell* v. *Rose,* 282 Ala. 358, 367, 211 So. 2d 489, 497–498, cert. denied, 393 U. S. 936 (1968); *Barnard* v. *Inhabitants of Shelburne,* 216 Mass. 19, 19–20, 22–23, 102 N. E. 1095, 1096–1097 (1913).

our statement in *Mathews* v. *Eldridge* that "the probable value . . . of additional . . . procedural safeguards" is a factor relevant to the due process inquiry. 424 U. S., at 335, quoted *supra*, at 100; see 424 U. S., at 343–347. But they provide little assistance in resolving cases like the present one, where the dismissal is based not on failing grades but on conduct-related considerations.[20]

In such cases a talismanic reliance on labels should not be a substitute for sensitive consideration of the procedures required by due process.[21] When the facts disputed are of a type susceptible of determination by third parties, as the allegations about respondent plainly were, see *ante,* at 91 n. 6, there is no more reason to deny all procedural protection to one who will suffer a serious loss than there was in *Goss* v. *Lopez,* and indeed there may be good reason to provide even more protection, as discussed in Part II, *supra.* A court's

---

[20] See *Brookins* v. *Bonnell,* 362 F. Supp. 379, 383 (ED Pa. 1973):

"This case is not the traditional disciplinary situation where a student violates the law or a school regulation by actively engaging in prohibited activities. Plaintiff has allegedly failed to act and comply with school regulations for admission and class attendance by passively ignoring these regulations. These alleged failures do not constitute misconduct in the sense that plaintiff is subject to disciplinary procedures. They do constitute misconduct in the sense that plaintiff was required to do something. Plaintiff contends that he did comply with the requirements. Like the traditional disciplinary case, the determination of whether plaintiff did or did not comply with the school regulations is a question of fact. Most importantly, in determining this factual question, reference is not made to a standard of achievement in an esoteric academic field. Scholastic standards are not involved, but rather disputed facts concerning whether plaintiff did or did not comply with certain school regulations. These issues adapt themselves readily to determination by a fair and impartial 'due process' hearing."

[21] The Court's reliance on labels, moreover, may give those school administrators who are reluctant to accord due process to their students an excuse for not doing so. See generally Kirp, Proceduralism and Bureaucracy: Due Process in the School Setting, 28 Stan. L. Rev. 841 (1976).

characterization of the reasons for a student's dismissal adds nothing to the effort to find procedures that are fair to the student and the school, and that promote the elusive goal of determining the truth in a manner consistent with both individual dignity and society's limited resources.

## IV

While I agree with the Court that respondent received adequate procedural due process, I cannot join the Court's judgment because it is based on resolution of an issue never reached by the Court of Appeals. That court, taking a properly limited view of its role in constitutional cases, refused to offer dictum on respondent's substantive due process claim when it decided the case on procedural due process grounds. See 538 F. 2d, at 1321 n. 5, quoted *ante,* at 91. Petitioners therefore presented to us only questions relating to the procedural issue. Pet. for Cert. 2. Our normal course in such a case is to reverse on the questions decided below and presented in the petition, and then to remand to the Court of Appeals for consideration of any remaining issues.

Rather than taking this course, the Court here decides on its own that the record will not support a substantive due process claim, thereby "agree[ing]" with the District Court. *Ante,* at 92. I would allow the Court of Appeals to provide the first level of appellate review on this question. Not only would a remand give us the benefit of the lower court's thoughts,[22] it

---

[22] It would be useful, for example, to have more careful assessments of whether the school followed its own rules in dismissing respondent and of what the legal consequences should be if it did not. The Court states that it "disagree[s] with both respondent's factual and legal contentions." *Ante,* at 92 n. 8. It then asserts that "the record clearly shows" compliance with the rules, *ibid.,* but it provides neither elaboration of this conclusion nor discussion of the specific ways in which respondent contends that the rules were not followed, Brief for Respondent 42–46, contentions accompanied by citations to the same record that the Court finds so "clear." The statement of the District Court quoted by the Court, *ante,*

would also allow us to maintain consistency with our own Rule 23 (1)(c), which states that "[o]nly the questions set forth in the petition or fairly comprised therein will be considered by the court." By bypassing the courts of appeals on questions of this nature, we do no service to those courts that refuse to speculate in dictum on a wide range of issues and instead follow the more prudential, preferred course of avoiding decision—particularly constitutional decision—until " 'absolutely necessary' " to resolution of a case. *Ashwander* v. *TVA*, 297 U. S., at 347 (Brandeis, J., concurring).

I would reverse the judgment of the Court of Appeals and remand for further proceedings.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE BRENNAN joins, concurring in part and dissenting in part.

The Court's opinion, and that of MR. JUSTICE MARSHALL, together demonstrate conclusively that, assuming the existence of a liberty or property interest, respondent received all the procedural process that was due her under the Fourteenth

---

at 92 n. 8, is not inconsistent on its face with respondent's claim that the rules were not followed, nor is there anything about the context of the statement to indicate that it was addressed to this claim, see App. 45.

Review by the Court of Appeals would clarify these factual issues, which rarely warrant the expenditure of this Court's time. If the Court's view of the record is correct, however, then I do not understand why the Court goes on to comment on the legal consequences of a state of facts that the Court has just said does not exist. Like other aspects of the Court's opinion, discussed *supra*, the legal comments on this issue are nothing more than confusing dictum. It is true, as the Court notes, *ante*, at 92 n. 8, that the decision from this Court cited by respondent was not expressly grounded in the Due Process Clause. *Service* v. *Dulles*, 354 U. S. 363 (1957). But that fact, which amounts to the only legal analysis offered by the Court on this question, hardly answers respondent's point that some compliance with previously established rules—particularly rules providing procedural safeguards—is constitutionally required before the State or one of its agencies may deprive a citizen of a valuable liberty or property interest.

Amendment. That, for me, disposes of this case, and compels the reversal of the judgment of the Court of Appeals.

I find it unnecessary, therefore, to indulge in the arguments and counterarguments contained in the two opinions as to the extent or type of procedural protection that the Fourteenth Amendment requires in the graduate-school-dismissal situation. Similarly, I also find it unnecessary to choose between the arguments as to whether respondent's dismissal was for academic or disciplinary reasons (or, indeed, whether such a distinction is relevant). I do agree with MR. JUSTICE MARSHALL, however, that we should leave to the District Court and to the Court of Appeals in the first instance the resolution of respondent's substantive due process claim and of any other claim presented to, but not decided by, those courts.

Accordingly, I, too, would reverse the judgment of the Court of Appeals and remand the case for further proceedings.