Kent J. DELANEY, Petitioner
and Respondent,

v.

Norman W. HEIMSTRA, Dean of the University of South Dakota Graduate School, Dale E. Clement, Dean of School of Business, University of South Dakota, Charles N. Kaufman, Director of the Masters of Business Administration Program, The Committee on Graduate Studies, and G. D. Hadley, D. A. Johnson, J. W. Johnson, R. L. Johnson, B. D. Perkins, J. D. Taylor, J. E. Powell, P. C. Fisher, Constituting said Members of said Board, Defendants and Appellants.

No. 12689.

Supreme Court of South Dakota.

Argued Oct. 16, 1979.

Decided Feb. 20, 1980.

Leon J. Vander Linden, Webster, for petitioner and respondent; Richard A. Glynn, Sioux Falls, on brief.

David L. Knudson of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendants and appellants.

HENDERSON, Justice.

## ACTION

This is an appeal from a judgment of the Circuit Court, First Judicial Circuit, which ordered the issuance of a peremptory writ of mandamus requiring various university officials and professors comprising the Committee on Graduate Studies (appellants) to hold a hearing with regard to Kent J. Delaney's (respondent) continued enrollment in the Masters of Business Administration program (MBA) at the University of South Dakota School of Business. We reverse.

## PROCEDURAL HISTORY

On September 6, 1978, the trial court ordered that an alternative writ of mandamus be issued directing appellants to reinstate Delaney and allow him to complete the MBA program or show cause why they

have not done so on October 6, 1978. Appellants filed motions to dismiss which were supported by a lengthy affidavit of Dr. Kaufman, Director of the MBA program. At a hearing on October 6, 1978, no testimony was presented by witnesses from either side, but the parties entered into an oral stipulation with respect to certain facts outlined below.

## FACTS

Delaney was admitted to the MBA program in August of 1977, and from that time until August of 1978, was a student in that program. He was dismissed by appellants for failure to meet the academic minimum scholastic average of 3.0 (B) required for graduation of all MBA candidates. Delaney's grade point average at the completion of thirty credit hours was a 2.8, falling short of the minimum requirement. Following the 1978 summer semester, Dr. Kaufman approached Delaney and informed him that he would not be permitted to enroll for additional courses in the program without the approval of the Committee on Graduate Studies. Dr. Kaufman indicated that with only two hours remaining to be taken for the degree, it was mathematically impossible for Delaney to raise his grade point average to a 3.0, even with two hours of A. This conversation was confirmed by a letter from Dr. Kaufman to Delaney dated August 5, 1978. On August 17, 1978, Delaney wrote Dr. Kaufman requesting that he be given an opportunity to take additional courses in order to remedy his grade point average deficiency.

Shortly after receiving Delaney's letter, Dr. Kaufman called a meeting of the Committee on Graduate Studies for the MBA program to discuss Delaney's request for special consideration and his suggestion that he be permitted to take certain courses to raise his grade point deficiency. The committee considered and denied Delaney's request on the grounds that he failed to show mitigating or unusual circumstances qualifying him for special relief. Dr. Kaufman wrote Delaney informing him that the committee had met and had denied his request for special consideration. Dr. Kaufman again met with Delaney following the committee's decision. He suggested that Delaney either take courses outside the Business School at the University of South Dakota, and based upon his results in those courses, re-apply for admission to the program, or alternatively, that he re-apply following some additional work experience in the business community.

Dr. Kaufman stated in his lengthy affidavit that the standard procedures involved in severing a person from enrollment in the MBA program for academic reasons were complied with in Delaney's case. In the first instance, the student is notified either in person or in writing of his or her grade point or other academic deficiencies. In addition, if the student so requests, he may have this deficiency reviewed by the Committee on Graduate Studies for the program to determine whether the student should be given special consideration and allowed to take remedial steps to correct his grade point or other academic deficiencies. Following the spring semester of 1978, Dr. Kaufman conversed with Delaney and advised him that in order to raise his deficient grade point average to the required 3.0 minimum for graduation, he would need at least six hours of A during the 1978 summer semester. · Delaney's request for special consideration was reviewed by the committee. Dr. Kaufman indicated that Delaney is one of approximately five to seven students each year, out of a program of sixty candidates, who do not complete and are dropped from the MBA program for academic reasons.

Delaney contends, however, that other similarly situated students were afforded the opportunity to appear before the committee prior to being dropped, or were allowed to continue in the program. He claims that he should be afforded the opportunity to appear before the committee to hear the reasons for his dismissal and to present any alternative plans for meeting the requirements of the program. Delaney maintains that the committee, by failing to inform him of the time in which they met

to discuss his request, acted arbitrarily and capriciously in preventing him from presenting an alternative plan for successful completion of the MBA program. Appellants, on the other hand, contend that their determination not to grant Delaney's request for special consideration was an appropriate exercise of their academic discretion, and that Delaney is not entitled to a hearing in relation to his dismissal based on academic cause. Appellants contend further that Delaney has failed to present any evidence suggesting that it acted arbitrarily or capriciously. The committee claims that Delaney's case was not similar to those of students who were granted special relief, for his grades were not reflective of any unusual or mitigating circumstances.

## ISSUES

(1) Whether due process necessitates that a student, dismissed for academic cause, be afforded a hearing before the school's decision-making body on the matter of his or her dismissal. We hold that it does not.

(2) Whether the Committee on Graduate Studies of the School of Business acted arbitrarily or capriciously in not affording petitioner an opportunity to appear before it concerning his request for special consideration, when similarly situated students allegedly had been allowed to continue upon a showing of mitigating or unusual circumstances. We hold that it did not.

## DECISION

### I.

Delaney contends that a student's interest in attending a public university is a property right protected by the due process clause of the Fourteenth Amendment; therefore, he cannot be divested of this property right without adequate notice and an opportunity to be heard prior to expulsion. The United States Supreme Court has refrained comment on the issue of whether a student's position at a public university is a constitutionally protected right. Rather, it has addressed this issue on those procedures which must be accorded a student at a state educational institution whose dismissal may constitute a deprivation of liberty or property within the meaning of the Fourteenth Amendment. *Bd. of Curators of University of Mo. v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). Since the merits of the instant case can be resolved within a similar context, we, too, need not pass on the constitutional issue. *House of Seagram, Inc. v. Assam Drug Co.*, 83 S.D. 320, 159 N.W.2d 210 (1968).

There has long been a distinction between a student's due process rights concerning disciplinary dismissals on the one hand, and academic dismissals on the other. Over the years, state and lower federal courts have carefully limited the procedural due process requirements of notice and hearing to decisions regarding the suspension or dismissal of a student for disciplinary purposes, rejecting the argument that school officials must also grant a hearing before expelling a student on academic grounds. The United States Supreme Court, in *Horowitz*, alluded to this dichotomy between a student's due process rights in disciplinary and academic dismissals explaining, "Academic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative fact-finding proceedings to which we have traditionally attached a full hearing requirement." *Bd. of Curators of University of Mo. v. Horowitz*, supra 435 U.S. at 89, 98 S.Ct. at 955, 55 L.Ed.2d at 134. *See also Miller v. Hamline University School of Law*, 601 F.2d 970 (8th Cir. 1979). The Court recognized, as have courts for over sixty years, that a hearing may be regarded as helpful to the ascertainment of misconduct, but may be useless or harmful in finding out the truth concerning scholarship. See *Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir. 1976); *Barnard v. Inhabitants of Shelburne*, 216 Mass. 19, 102 N.E. 1095 (1913).

The Court, noting these distinctions, reversed the Eighth Circuit Court of Appeals and held that the procedural due process protection of the Fourteenth Amendment

does not necessitate that a student dismissed for academic cause be afforded a hearing before the school's decision-making body. *Bd. of Curators of University of Mo. v. Horowitz,* supra. The court went on to note:

The decision to dismiss respondent . . rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal. Such a judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision. Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.

Under such circumstances, we decline to ignore the historic judgment of educators and thereby formalize the academic dismissal process by requiring a hearing. Id. 435 U.S. at 89–90, 98 S.Ct. at 955, 55 L.Ed.2d at 135.

■ According to the Court, "This difference calls for far less stringent procedural requirements in the case of an academic dismissal." Id. at 86, 98 S.Ct. at 953, 55 L.Ed.2d at 133. The Court was reluctant, however, to propose any guidelines under which school officials must operate to satisfy the minimum due process requirements in cases of academic dismissals. It merely indicates by means of dicta that in this instance, the school went beyond what was constitutionally required by affording Ms. Horowitz the opportunity to be examined by seven independent physicians to insure a fair assessment of her medical skills. Apart from those measures, Ms. Horowitz was notified of her "unsatisfactory" rating in her clinical performance and was advanced to her second and final year on a probationary basis. Inasmuch as *Horowitz* did not establish any definitive standards necessary to

meet the minimum due process requirements in the area of academic dismissals, we adopt the standard set forth in *Gaspar v. Burton,* 513 F.2d 843 (10th Cir. 1975):

[S]chool authorities, in order to satisfy Due Process prior to termination or suspension of a student for deficiencies in meeting minimum academic performance, need only advise that student with respect to such deficiencies in any form. All that is required is that the student be made aware prior to termination of his failure or impending failure to meet those standards. Id. at 851.

■ Delaney was informed that he was in scholastic trouble following the 1978 spring semester. Prior to entering the summer semester, he was also notified regarding the grades he would need to obtain in order to complete the program. After failing to meet the academic criteria, Delaney was afforded an opportunity to have his request for special consideration reviewed by the MBA Committee for a further determination on his continued enrollment. We hold that the actions taken by the university officials satisfied the procedural due process requirements, and that Delaney's rights thereunder were not violated.

II.

■ Delaney contends that the writ was properly issued in that the school officials abused their discretion and acted arbitrarily and capriciously in allowing certain students continued enrollment in the MBA program who did not meet academic standards, yet denying the same to him.

Notwithstanding the judiciary's customary "handsoff" policy in examining academic dismissals, some courts have ordered a fair and impartial hearing when a student's expulsion results from arbitrary, capricious, or bad-faith actions of school officials. *See Abbariao v. Hamline University School of Law,* 258 N.W.2d 108 (Minn.1977); *Brookins v. Bonnell,* 362 F.Supp. 379 (E.D.Penn.1973). In *Abbariao,* the Minnesota Supreme Court held that an allegation in the petition that the student's examinations were "singled

out for special consideration and grading by his professors" constituted an allegation of arbitrary and capricious conduct. The court in *Bonnell* granted a nursing student a hearing on the grounds that plaintiff's dismissal was premised on disciplinary matters, rather than academic deficiencies as the school contended.

The United States Supreme Court in *Horowitz* did not pass directly on the validity of those decisions affording students a hearing under such circumstances. The Court merely stated, "Even assuming that the courts can review under such a standard an academic decision of a public educational institution . . . no showing of arbitrariness or capriciousness has been made in this case." Id. 435 U.S. at 91–92, 98 S.Ct. at 956, 55 L.Ed.2d at 136. We likewise refrain comment on the propriety of a court's intervention in such matters, for we find no showing of arbitrary or capricious conduct in the case at bar.

Delaney's petition alleges arbitrary conduct on the part of the MBA Committee in its refusal to afford him a hearing which was customarily granted to other students facing academic repercussions. Delaney, however, fails to prove such allegations. He merely draws inferences that these allegedly similarly situated students who received special consideration must have been afforded an opportunity to appear before the committee. Not once does he cite any particular case where a student, allegedly in his same position, received special consideration and an opportunity to appear before the committee. Although the committee admittedly allowed certain students with grade point deficiencies to continue, it was quick to note that these exceptions were made in cases where the student showed mitigating or unusual circumstances. Delaney's letter did not indicate any mitigating reasons which attributed to his grade point deficiency; rather, he only alluded to certain classes which he wished to take in order to remedy his scholastic defalcation. Furthermore, the record is void of any evidence such as that found in *Abbariao or Bonnell* which may afford a basis for judicial review.

We therefore hold that the issuance of the peremptory writ was wrongfully ordered. A writ cannot issue in matters of academic discretion for no purpose other than merely "to insure," as the trial court stated, "that the actions of the committee were not arbitrary."

Accordingly, we reverse.

All Justices concur.