JOHN N. EASAW, Plaintiff, v ST. BARNABAS HOSPITAL, Defendant.

Supreme Court, Bronx County, January 17, 1989

### APPEARANCES OF COUNSEL

*Noah A. Kinigstein* for plaintiff. *Garfunkel, Wild & Travis, P. C. (Norton L. Travis* of counsel), for defendant.

### OPINION OF THE COURT

NORMAN C. RYP, J.

#### A. ISSUE.

Hospital resident? Graduate student-doctor and/or employee? Does rationality and good faith under academic discretion and/or procedural due process govern termination?

An issue of first impression!

#### B. PROCEDURAL HISTORY AND PARTIES' CONTENTIONS.

In this CPLR article 78 proceeding, plaintiff, John N. Easaw (Dr. Easaw), a former second-year medical resident (PGY-II) of defendant, St. Barnabas Hospital (Hospital), seeks, by order to show cause, a preliminary injunction, under CPLR 6301, 6311,

for reinstatement pursuant to the parties' March 8, 1988 third-year residency (PGY-III) agreement (July 1, 1988-June 30, 1989) following termination, effective July 1, 1988.

According to Dr. Easaw, his discharge, as a Hospital staff employee, was without any prior notice or good cause and contrary to procedural due process of law. The Hospital, to the contrary, submits that ample prior notice and good cause were given to Dr. Easaw, a paid postgraduate student-doctor, for his termination, which was rationally made, in good faith and within its broad academic discretion.

This court held a four-day evidentiary hearing on August 4, 5, 8 and 11, 1988 involving seven witnesses (Drs. J. Easaw, Henry O'Kere and Sarah Easaw for plaintiff, with Drs. Scott Cooper, Malcolm Phillips, James G. Hellerman and Ms. Ann Bloom for the defendant) and 23 evidentiary exhibits. Dr. Andres Redondo, the Hospital's former chief medical resident (CMR), with substantial personal knowledge of disputed facts, having relocated to Florida on July 1, 1988, was not available except by posthearing affidavit, sworn to August 10, 1988, which must be disregarded as hearsay. All posthearing submissions were received in chambers during this court's summer vacation recess (Aug. 15-Sept. 12, 1988), without any hearing transcript.

### C. FINDINGS OF FACT.

After hearing and full review of all submissions and this court's notes, without benefit of transcript, the court finds the following facts, according maximum credibility to the evidentiary exhibits to help reconcile conflicting testimony amongst members of the healing profession.

1. *Before May 6, 1988*

Many facts until May 6, 1988 are uncontroverted, as follows. Dr. Easaw is a medical school graduate, who, before 1986, attended and satisfactorily completed medical schools in India (Jawaharlal Institute) and Stanford University. On June 22, 1987, Dr. Easaw satisfactorily completed his medical internship at Coney Island Hospital. St. Barnabas Hospital, a New York not-for-profit hospital corporation, with graduate medical internship and residency educational programs, is located at Third Avenue and East 183rd Street, Bronx, New York. On January 21, 1987, Dr. Easaw applied, was later accepted and satisfactorily completed (at least eight months) a second-year residency (PGY-II), covering the period from July

1, 1987 to June 30, 1988, in internal medicine at the Hospital. While claiming Dr. Easaw was a graduate "student doctor" on the Hospital staff, the Hospital used the following forms and memoranda received by Dr. Easaw which referred to Dr. Easaw or residents as "employee[s]":

(1) The Hospital's *"Absenteeism Policy [#508]"—dated May 16, 1988,* which applies to: "All employees" with its "PROCE-DURE" including that

"Supervisors are responsible for:

"e) taking progressive disciplinary measures to correct absenteeism/tardiness problems:

"1) Verbal Warning

"2) Written Warning

"3) Suspension

"4) Termination".

(2) Dr. Easaw's *"Employee Attendance Record"—1988,* covering the period from January 17 through June 30, 1988 denoting Dr. Easaw's attendance, sick (12 days a year) and vacation (four weeks a year) days.

(3) Hospital's *"Residents Benefit Summary"* received by Dr. Easaw at initial June 1987 orientation by the Hospital's director of medical education (Dir. M/E) (Dr. James G. Hellerman) includes at least four references to "employees" concerning: long-term disability coverage; voluntary annuity, municipal credit union; and supplemental life insurance programs. *N.B.* Its sick days and vacation allowance are identical to (2).

(4) Hospital's *"Authorization To Leave Work Area To Go To Employees Health Service"* and *"Employees Health Service Clinic",* dated May 6, 1988, completed for Dr. Easaw specifically.

(5) Covering letter, dated July 8, 1988, from Dr. James G. Hellerman, the Hospital's director of medical education (Dir. M/E) to Dr. Easaw enclosing the Hospital's *"Clearance Form for Terminating Employees"* and two of his interoffice memoranda, dated April 28 and May 9, 1988, respectively, directed "TO: MEDICAL HOUSESTAFF RE: *EMPLOYEE CLEARANCE FORMS".*

During February 1988, Dr. Easaw, having at least until then satisfactorily performed his second-year medical-residency (PGY-II) duties, was invited to continue in the Hospital's medical program as a third-year resident (PGY-III). To codify this the parties entered into renewal one-year written residency agreement, dated March 8, 1988, effective July 1, 1988

to June 30, 1989, which refers to Dr. Easaw as a "RESIDENT". From March 8 until at least May 6, 1988, Dr. Easaw performed his PGY-II duties with "satisfactory" to "superior" ratings on his clinical evaluations by Dr. Noel Fleischer, dated March 29, 1988. Ironically, Dr. Easaw's final clinical evaluation ratings on June 29 and 30, 1988 by Dr. Noel Fleischer and seven other physician-evaluators were "good" to mostly "excellent". Thus, until May 6, 1988, there is no factual controversy.

### 2. *After May 6, 1988*

Thereafter, especially during May 1988, the facts are increasingly disputed. On Friday, May 6, 1988, Dr. Easaw, scheduled to work day shift (8:00 A.M.-8:00 P.M.) at the intensive care unit (ICU), telephoned (8:30 A.M.) in sick (102 degree fever—cough and sore throat) to ICU's acting chief medical resident (A/CMR) Dr. B. Al-Ujayle. The A/CMR referred Dr. Easaw to the employees health service clinic to be examined by Dr. Firat, who prescribed ampicillin, an antibiotic, and excused Dr. Easaw "Off Duty" for May 6-7, 1988, with Sunday, May 8, 1988, a normal off-duty day, to return to work on Monday, May 9, 1988. According to Dr. Hellerman, the Hospital's Dir. M/E, upon learning of Dr. Easaw's May 6, 1988 absence, met with the Hospital's ICU's director and acting CMR (Drs. Robert Menkel and Al-Ujayli) that day and after noting that Dr. Easaw had the highest absenteeism (Nov. 1987 —two weeks off—inflamed testicles; Jan. 1988—two days off— sprained ankle) of any ICU resident, Dr. Easaw should personally contact Dr. Hellerman for any future absences or lateness. During the following Monday morning, May 9, 1988, Dr. Easaw telephoned the Hospital's CMR, Dr. Andres Redondo (unavailable for this hearing, as noted above), and later spoke by telephone to Dr. Hellerman, complaining about body lesions due to antibiotic reactions and would be out that day (May 9, 1988) and return the next day, if better.

While there is a direct testimonial conflict between Drs. Easaw and Hellerman as to whether Dr. Easaw appeared for ICU duty on May 10, 1988, this court will accredit the Hospital's "Employee's Attendance Record" which noted "S" (sick day) for that day. Whether Dr. Sarah Easaw, a then Harlem Hospital intern and plaintiff's wife, who directly denied same, appeared at Dr. Hellerman's office and spoke to his secretary, Mrs. Ann Bloom, on May 10, 1988 is problematical. The court notes that Mrs. Bloom was uncertain of the exact date, could not identify Dr. Easaw's spouse in court and compiled the

Hospital's "Employee's Attendance Record" which indicated Dr. Easaw was "on duty" that day, May 10, 1988. Thus, the court will accredit the denial of Dr. Sarah Easaw, who testified she was "on duty" as a Harlem Hospital intern on May 10, 1988.

Whether Drs. Hellerman, Easaw and Redondo (unavailable at the hearing) had an unscheduled May 11, 1988 meeting in Dr. Redondo's office whereat Dr. Easaw, who denied same, confessed to fabricating "chicken pox", which Dr. Hellerman explained as "extremely serious" to be reviewed at a future, unspecified, meeting of the Medical Education Committee, whose members Dr. Easaw could lobby prior thereto, an unusual procedure for a fair and impartial body, is not very material to this court's fact-finding role. Without further corroboration, this court neither accredits nor discredits the conflicting testimony of the only two very interested and available witnesses (Drs. Hellerman and Easaw).

Thereafter, a special meeting of the Medical Education Committee (MEC), whose exact and total membership is uncertain, was scheduled for May 19, 1988, at 11:00 A.M. The amount of oral prior notice was disputed, with three days according to Dr. Hellerman and immediate "beeper" notice, according to Dr. Easaw. Neither appear overgenerous in view of the professional consequences to Dr. Easaw. According to the testimony of Dr. Hellerman, Dr. Scott Cooper, the Hospital's director of respiratory therapy, and Dr. Malcolm Phillips, the Hospital's director of medicine, Dr. Easaw, who wholly denies same, contacted them and other MEC members to admit and apologize for the "chicken pox fabrication" due to emotional stress and ask for their compassionate understanding.

At the MEC May 19, 1988 meeting, according to Dr. Easaw, he was given 10 minutes to explain his May 1988 and previous absences, which predate his March 8, 1988 renewal one-year residency (PGY-III) agreement and was then excused. Dr. Easaw testified that he was not advised of his termination until the evening of the day before, June 29, 1988, his effective June 30, 1988 termination, when he requested a MEC meeting held July 5, 1988 which, with five additional members, considered the matter and affirmed Dr. Easaw's termination. The Hospital's version of both meetings was set forth in Dr. Cooper and Dr. Hellerman's testimony, present at both the MEC's May 19 and July 5, 1988 meetings, which confirmed the Hospital's minutes thereof, basing Dr. Easaw's termina-

tion upon a "pattern of lack responsibility demonstrated by previous absences" and barring Dr. Easaw from taking the internal medicine boards. Thereafter, on May 23, 1988, according to Dr. Hellerman's testimony and set forth in his inter-office memorandum of like date, which was totally denied by Dr. Easaw, Dr. Hellerman met with Dr. Easaw, and explained the MEC's unanimous termination consensus decision on May 19, 1988, including psychiatric counselling (never given) as a condition of completion of his then current PGY-II year, ending June 30, 1988.

This court is reluctant to discredit the veracity of any doctor's testimony, including the Hospital's noted directors of medicine, medical education and respiratory therapy as well as a prospective doctor, with an apparent partial language problem with certain American-English words. In view of the procedural problems set forth hereinbelow, it is neither necessary nor constructive to future resolution, if the physicians cannot heal themselves, for this court to accredit or discredit such testimony at this time. "Who shall decide when doctors disagree, And soundest casuists doubt, like you and me." (Alexander Pope, Moral Essays, Ep III, To Lord Bathurst [1731-1735].)

### D. APPLICABLE LAW

#### 1. *Preliminary Injunctive Relief*

To obtain a preliminary injunction, under CPLR 6301, 6311, it is well settled by New York case law that the party seeking relief must demonstrate: (1) reasonable likelihood of success upon the merits; (2) irreparable harm, absent a grant of injunctive relief; and (3) the balancing of the equities in favor of the applicant. *(Yan's Video v Hong Kong TV Video Programs,* 133 AD2d 575, 578 [1st Dept 1987]; *Albini v Solork Assocs.,* 37 AD2d 835 [2d Dept 1971]; *Kaufman v International Business Machs. Corp.,* 97 AD2d 925 [3d Dept 1983], *affd* 61 NY2d 930 [1984].) It is extraordinary relief not routinely granted. *(Medical Socy. v Toia,* 560 F2d 535 [2d Cir 1977].)

To establish these elements there must be competent proof including evidentiary detail, with preliminary injunctive relief denied if key facts are in dispute, as herein, or absent a clear right. *(Faberge Intl. v Di Pino,* 109 AD2d 235 [1st Dept 1985]; *Little India Stores v Singh,* 101 AD2d 727, 728 [1st Dept 1984].)

In this case, after careful and thorough consideration of all

competent and credible evidence including submissions, Dr. Easaw has failed to sustain his CPLR 6301, 6311 motional burden to obtain a preliminary injunction, with the greatest gap in the key required element of reasonable likelihood of success based upon the current record. While such denies Dr. Easaw's CPLR 6301, 6311 motion for a preliminary injunction, without prejudice, it does not end this matter.

2. *Hospital Resident Physicians or Doctors—Graduate Students and/or Staff Employees, with what, if any, due process of law requirements before termination?*

This appears to be an issue of first impression never squarely decided in connection with an individually terminated hospital resident.

Physicians in graduate medical education are called resident physicians or residents. Graduate medical education is organized by specialty (i.e., from allergy and immunology to internal medicine [as herein] to urology), under the sponsorship of hospitals, medical schools, medical centers or other institutions. Each residency program is organized and directed by a program director, with staff responsible for the education, training and supervision of the residents. *(Preface,* The Essentials of Accredited Residencies in Graduate Medical Education, Accreditation Council for Graduate Medical Education [ACGME], eff July 1, 1982.) In addition, "There must be institutional procedures which provide for *due process* for all parties potentially involved when actions are contemplated which could result in dismissal or could significantly threaten a resident's intended career development". *(See,* Due Process, The Essentials of Accredited Residencies in Graduate Medical Education, *op. cit.,* part 5, ¶ 5.1.6; emphasis supplied.)

Medical residency programs in teaching hospitals are a vital form of postgraduate medical education, with the object that those who successfully complete them have the requisite skill and training to practice medicine *(Interfaith Med. Center v Sabiston,* 136 AD2d 238, 239 [2d Dept 1988]). The courts will intervene in academic matters only if an institution exercises its discretion in an arbitrary or irrational fashion or in bad faith *(Matter of Patti Ann H. v New York Med. Coll.,* 88 AD2d 296 [2d Dept 1982], *affd* 58 NY2d 734 [1982] [involving a freshman medical student who failed six courses]; *Matter of Levy [City Univ.],* 57 NY2d 925 [1982] [involving a fifth-year biomedical student who failed neurobiology which City University of New York required him to repeat]; *Matter of Sofair*

*v Upstate Med. Center Coll. of Medicine,* 44 NY2d 475, 479 [1978] [concerning a fourth-year medical student dismissed for academic reasons, i.e., " 'failure to demonstrate sufficient clinical aptitude for the practice of medicine' "]).

However, where a medical student's dismissal is for disciplinary, as distinct from academic, reasons, due process requires oral or written notice of the charges and, if denied, an explanation of the evidence and an opportunity to present his or her side of the story, with at least "an 'informal give and take' ". *(Board of Curators v Horowitz,* 435 US 78, 86 [1978].) This case, cited by respondent with factual and procedural distinctions, involved a medical student in a two-year course, who was first criticized, during her first year was unsatisfactory with her clinical performance (as distinct from Dr. Easaw's "good" to "excellent" ratings) during a pediatrics rotation, erratic in her clinical attendance and lacked concern for personal hygiene, yet has advanced to her second and final year on probation, with further faculty dissatisfaction expressed to petitioner, plus another, with her surgery rotation, with the coordinating committee concluded that, without radical improvement, she be dropped as a student. Ms. Horowitz was allowed to appeal and take her second-year final examinations under supervision of seven practicing physicians, most of whom recommended continued probation, and was allowed a second appeal to the university provost who sustained the dismissal for academic reasons. While lacking a formal hearing, Ms. Horowitz was fully informed of faculty clinical dissatisfaction and the consequent threat to her graduation, given a second and third chance on probation, plus two appeals, while allowed to take second-year finals, then dismissed which is quite distinct from the subject facts wherein the record does not show that any consequential warning or progressive measures (i.e., suspension or probation) or appeal above the MEC prior to the maximum measure of Dr. Easaw's termination.

Besides, under certain circumstances, an intern or a resident (i.e., hospital house staff, as herein) may be considered an employee. That distinguished jurist, the late United States Supreme Court Justice Benjamin N. Cardozo, while a Judge of the New York Court of Appeals, noted that " '[t]he duties of an interne * * * are administrative as well as scientific' " in upholding an intern's right, opposed by the hospital therein to a workman (now worker)'s compensation award. *(Matter of Bernstein v Beth Israel Hosp.,* 236 NY 268, 270 [1923].) Moreover, it is still not completely certain whether the New York

State (as distinct the "National") Labor Relations Board considers hospital interns and residents "employees", as distinct from "students" covered by the New York State Labor Relations Act (Labor Law § 701 [3]) for their associations to be certified as collective bargaining units. *(Application of Comm. of Interns & Residents v New York State Labor Relations Bd.,* 420 F Supp 826, 829-831 [SD NY 1976]; *see, Montefiore Hosp. & Med. Center [New York State Fedn. of Physicians & Dentists],* 261 NLRB No. 82 [1982] [concerning NLRB coverage].) It appears that the wisest and most equitable course is to decide the issue on a case-by-case, or totality of the circumstances, basis. *(Physicians Natl. House Staff Assn. v Fanning,* 642 F2d 492, 500 [DC Cir 1980], *cert denied sub nom. Physicians Natl. House Staff Assn. v Murphy,* 450 US 917 [1981].) To this the court now fully turns.

Herein, it is undeniable that Dr. Easaw was partly a graduate student-doctor. *(See, Interfaith Med. Center v Sabiston, supra,* and authorities cited therein.) Residents were appointed, not hired or employed, their terms called PGY (postgraduate year) and under the jurisdiction of the Dir. M/E, Dr. James G. Hellerman, who cosigned Dr. Easaw's residency agreements and the MEC, who sought to comply with ACGME certification criteria. Dr. Easaw was regularly evaluated for his clinical ICU work, necessary to be a practicing physician.

On the other hand, clearly said residents, including Dr. Easaw, who was paid an annual salary of $30,201 for his services, were deemed employees for certain purposes, required to comply with all employee forms and procedures *(see,* items 1-5 above, at 482). The first contact and the final correspondence between Drs. Hellerman and Easaw were the explanation of "Residence Benefit Summary" (with at least four references to "employees") and enclosure of the then current Hospital employees clearance forms, requiring return of ID cards, keys, uniforms and beeper before receipt of his final paycheck. Dr. Easaw's residency agreement was cosigned by Dr. Ronald Gade, president of the Hospital.

If Dr. Easaw were both a graduate student-doctor and an employee so that both parties, as in the famous clerical comment "are right", where does that leave this court in applying the law? The answer is further factual inquiry and analysis of the legal relationship between the Hospital and Dr. Easaw beyond legal labels. What Dr. Easaw was charged with was "absenteeism" and such is not directly consistent with academic criteria violations. As noted above, Dr. Easaw's

medical competence (with "excellent" in clinical ratings at the end of his second-year residency) was never questioned, contrary to *Sofair v Upstate Med. Center (supra)*, and other academic case citations. Clearly, his employee self-discipline (absenteeism), evincing some lack of responsibility with professional overtones, was in issue.

Thus, some informal degree ("give and take") of procedural due process of law, as required by ACGME criteria and the Hospital's absenteeism policy, including progressive disciplinary measures *(see, Board of Curators v Horowitz*, 435 US, *supra*, at 84-86) was required. In addition, as noted above, the Hospital was required to follow its own absenteeism policy of progressive disciplinary measures (verbal then written warnings, suspension and then finally, termination), as well as the procedural requirements of the Hospital's manual. On this, the record is either clearly incomplete or inadequate.

### E. CONCLUSION

While it is clear that Dr. Easaw has not yet sustained his CPLR 6301, 6311 motional burden, especially the likelihood of success on the merits, with many key facts in dispute *(see, Little India Stores v Singh, supra)*, so that his motion for a preliminary injunction is denied, without prejudice.

However, this court, in the full interest of justice and equity finds in fact and law, that the Hospital did not adequately comply with that level and quality of due process of law, required by ACGME requirements (i.e., procedures written and known to residents, as not herein), its own absenteeism policy No. 508 (progressive disciplinary measures [not taken herein] and its own manual [president and/or up to three vice-presidents plus director of medicine] for appellate review not done herein), to which Dr. Easaw is entitled as a hybrid graduate student-doctor and Hospital staff employee. This is especially so in this matter since Dr. Easaw satisfactorily completed his medical school training and education, internship and at least 75% of his second year of residency (PGY-II) with only a third year of residency (PGY-III) final year, internal medicine boards, to complete before being eligible to be licensed as a practicing physician. Such procedural due process, under the facts, circumstances and applicable law herein, should include 10 days' prior written notice of the

charge(s); an MEC rehearing with a written record, including due consideration of lesser penalties (i.e., probation or suspension) and review by the Hospital's governing body as required by its manual, subject to judicial review. Accordingly, for the reasons set forth hereinabove, this matter is remanded to the Hospital in compliance thereof.