# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-4162

_____

| | | |
|---|---|---|
| John Richmond, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Karrol Fowlkes, Individually and as | * | |
| Associate Dean of the College of | * | Appeal from the United States |
| Pharmacy of the University of Arkansas | * | District Court for the |
| for Medical Sciences; Jonathan J. Wolfe, | * | Eastern District of Arkansas. |
| Individually and as Chairman of the | * | |
| Scholastic Standing Committee of the | * | |
| College of Pharmacy of the University | * | |
| of Arkansas for Medial Sciences; Larry | * | |
| D. Milne, Individually and as Dean of | * | |
| the College of Pharmacy of the | * | |
| University of Arkansas for Medical | * | |
| Sciences; University of Arkansas Board | * | |
| of Trustees, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: June 15, 2000

Filed: October 2, 2000

_____

Before WOLLMAN, Chief Judge, BEAM, and BYE, Circuit Judges.

_____

WOLLMAN, Chief Judge.

John Richmond appeals from the district court's[1] grant of summary judgment to the Board of Trustees of the University of Arkansas and various named administrators at the College of Pharmacy of the University of Arkansas for Medical Sciences (the College) in the action he brought against them after his dismissal from the pharmacy program. We affirm.

**I.**

We recite the facts in the light most favorable to Richmond. Richmond enrolled in the College of Pharmacy in the fall of 1993 and successfully completed five semesters of the eight-semester program. In evaluating academic progression, the College utilizes "non-cognitive evaluations," reports submitted by a professor about a student's performance in a course in areas such as preparedness, maturity in interpersonal relations, timeliness, and various other attributes of professionalism considered "non-cognitive" but relevant to the academic development of future pharmacists. A professor makes an evaluation of each student's non-cognitive performance, but a report is filed only for those students who perform exceptionally and for those who perform inadequately. A student may be dismissed by the College's Scholastic Standing Committee (Scholastic Committee) for receiving two negative non-cognitive evaluations. During the spring semester of Richmond's third year, two of his professors submitted negative non-cognitive evaluations for his behavior, which included the failure of basic examinations, sleeping in and lack of preparation for class, and inappropriate commentary during class.

---

[1]The Honorable William R. Wilson, Jr., United States District Judge for the Eastern District of Arkansas.

Dr. Karrol Fowlkes, Associate Dean for Student and Academic Affairs, notified Richmond of the negative non-cognitive evaluations and asked him to submit a written explanation for the behavior. Richmond responded in a letter that told the faculty and Scholastic Committee "what they wanted to hear," assuring them that such behavior would not be repeated. The Scholastic Committee met shortly thereafter and ultimately voted to place Richmond on academic probation until he received his degree. The Scholastic Committee sent Richmond a letter informing him that another negative non-cognitive evaluation would result in his dismissal from the College.

In June of 1996, university police officers reported to Dr. Fowlkes that Richmond had been drinking, playing loud music, and yelling in the hallway of his residence hall. Dr. Fowlkes referred Richmond to a committee that deals with addiction problems, not the Scholastic Committee. Subsequently, in the fall of 1996, Richmond successfully completed the four clinical rotation courses of his seventh semester in the program.

In January of 1997, Richmond began a fifth rotation at a facility in Pine Bluff, Arkansas, under the supervision of Dr. Sherry May-Myatt. During this rotation, Richmond fell behind on patient presentations and several times arrived late or not at all. Mid-rotation, on January 17, 1997, Dr. May-Myatt informed Richmond that he was failing and that she would ask for him to be dismissed from her rotation if he again arrived late or failed to show up without notifying her in advance. A week passed without incident, but problems soon recurred. Dr. May-Myatt spoke with the Chair of the Department of Pharmacy Practice, who in turn contacted Dr. Fowlkes for an outline of the available options for dealing with Richmond's unprofessional conduct and then relayed the information to Dr. May-Myatt. On January 29, 1997, Dr. May-Myatt submitted a negative non-cognitive evaluation on Richmond and notified him that she had done so. Her evaluation noted behavior such as Richmond's unexplained absenteeism, his failure to look up the appropriate medication dosage for a 21-month-

old patient, and his belligerent and argumentative response to Dr. May-Myatt on January 24, 1997.

On February 3, 1997, Dr. Fowlkes officially notified Richmond of Dr. May-Myatt's negative non-cognitive evaluation and suspended him from rotations pending Committee action. The Scholastic Committee Chairman, Dr. Jonathan Wolfe, wrote a letter to Richmond on February 10, 1997, informing him that a meeting would be held on February 14, 1997. The letter informed Richmond of the date, time, and place of the meeting, that the negative evaluation would be considered, and that Richmond could appear in person to make an oral statement and answer questions, could present a written statement from himself or others on his behalf, and could present approved witnesses. Dr. Wolfe also informed Richmond of the process in person.

At the February 14 hearing, Richmond appeared, spoke to the Scholastic Committee, answered questions, and presented personal references in written form. The Committee notified Richmond of its timetables for future action and of his opportunity to protest any final decision. Richmond departed, and the Scholastic Committee deliberated. Dr. Fowlkes attended Scholastic Committee meetings as an ex-officio member but did not vote or participate in the deliberative process, acting solely as a source of historical information. The Scholastic Committee ultimately agreed to recommend Richmond's suspension, coupled with a plan for removal of the suspension and Richmond's eventual graduation. The Scholastic Committee sent Richmond a letter encouraging him to submit an appropriate plan with a list of elements that Richmond was "strongly encouraged" to include. Richmond submitted such a plan to the Committee on May 13, 1997. The Scholastic Committee revised the plan and sent it to Richmond with a notice that he should sign and return the plan by May 23, 1997, in order to remain in the College. Richmond failed to do so. Shortly after the May 23 deadline, Dean Larry D. Milne accepted the Scholastic Committee's recommendation and officially dismissed Richmond from the College. Richmond then brought this suit, contending that he was denied his constitutional rights to due process

and equal protection and that the individual administrators and faculty had conspired to deny him these rights. It is from the district court's grant of summary judgment in favor of the College that Richmond now appeals.

## II.

We review the district court's grant of summary judgment de novo. See Taylor v. Nimock's Oil Co., 214 F.3d 957, 959 (8th Cir. 2000). Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See id.; Fed. R. Civ. P. 56(c).

### A. Procedural Due Process

Richmond argues that he was denied due process of law because the Scholastic Committee did not constitute a fair tribunal. He contends that the process was unfair first because Dr. Fowlkes was biased and overly involved in the decision to dismiss him, and, second, because he should have been allowed to attend and be heard at the final deliberative meetings of the Scholastic Committee. He contends that his dismissal deprived him of his liberty interest in pursuing a career in pharmacy. Assuming, without deciding, the existence of a property or liberty interest, we conclude that Richmond received all the process that he was due.

To satisfy the Fourteenth Amendment, a student who is dismissed for academic reasons from a public university must be afforded notice of faculty dissatisfaction and potential dismissal, and the dismissal decision must be careful and deliberate. See Board of Curators of the Univ. of Missouri  v. Horowitz, 435 U.S. 78, 85 (1978). A formal hearing is not required for an academic dismissal. See Horowitz, 435 U.S. at 86 & n.3; Disesa v. St. Louis Community College, 79 F.3d 92, 95 (8th Cir. 1996); Ikpeazu v. University of Nebraska, 775 F.2d 250, 254 (8th Cir. 1985) (per curiam).

Richmond received notice on February 10, 1997, of the February 14 Scholastic Committee meeting to be held to discuss his situation and potential dismissal. From previous interaction with Dr. Fowlkes and the Scholastic Committee, Richmond was aware that the faculty was dissatisfied and that dismissal was possible, even likely. Dr. May-Myatt warned Richmond that she was dissatisfied and that she was submitting what would be his third negative non-cognitive evaluation. Thus, Richmond had sufficient notice of the faculty's dissatisfaction with his performance and of the possibility that he might be dismissed. He was given an opportunity to respond in his own defense and to submit a proposed remedial plan to the Scholastic Committee, and he could have appealed any adverse decision through the grievance process after the final decision.

The facts, even in the light most favorable to Richmond, also indicate that the College's decision was careful and deliberate. The Scholastic Committee actively sought Richmond's participation, evaluated all the evidence presented by Richmond and the faculty, and made its decision only after a series of meetings concerning the situation. Richmond has presented no evidence that suggests that the decision was other than careful and deliberate.

Richmond also contends that because his last negative non-cognitive evaluation involved a serious disciplinary matter, he should have received the greater due process protections afforded students dismissed for disciplinary, rather than academic, reasons. Richmond's behavior included failing exams, inappropriate behavior during class, lack of preparation, tardiness and absenteeism, and inappropriate interaction with instructors. If personal hygiene and erratic attendance may be appropriately considered by a medical school as factors bearing on a student's academic standing in a professional program, see Horowitz, 435 U.S. at 91 n.6, we cannot conclude that the College's consideration of Richmond's deficiencies as scholastic in nature was improper.

-6-

Richmond also argues that the Student Handbook requires that negative non-cognitive evaluations be referred to a more formal disciplinary committee, although several Handbook provisions indicate otherwise. The record indicates that the College's practice, which is based on the Handbook, has been to send all "normal" non-cognitive evaluations to the Scholastic Committee. Accordingly, we conclude that the College did not fail to follow its own procedures.

Richmond next contends that the decision-maker (the Committee) did not render a careful and deliberate decision because Dr. Fowlkes was biased against Richmond and acted as investigator, prosecutor, and adjudicator at the Scholastic Committee meetings. The College responds by noting that there is no evidence in the record to support Richmond's allegations of an unfair tribunal, either concerning Dr. Fowlkes's role or his bias. The College further points out that even had Dr. Fowlkes participated in the adjudicatory process, "the combination of investigative and adjudicative functions does not, without more, constitute a due process violation." Withrow v. Larkin, 421 U.S. 35, 58 (1975). Where administrative matters are concerned we must proceed on the assumption that the administrators are "entitled to a presumption of honesty and integrity unless actual bias, such as personal animosity, illegal prejudice, or a personal or financial stake in the outcome can be proven." Ikpeazu, 775 F.2d at 254; cf. Marler v. Missouri State Bd. of Optometry, 102 F.3d 1453, 1457 (8th Cir. 1996) (adjudicator's slight pecuniary interest in proceeding outcome does not violate due process).

Dr. Wolfe and other Scholastic Committee members stated that Dr. Fowlkes played no adjudicatory or prosecutorial role before the Scholastic Committee. According to the testimony, Dr. Folkwes's job was to present the information and documentation previously gathered and then to answer questions concerning past events. Dr. Fowlkes did not vote or participate in the deliberation regarding Richmond. Additionally, Dean Milne testified that Dr. Fowlkes has no control over or input into

which faculty members are chosen to sit on the Scholastic Committee. To counter this testimony, Richmond offered only his speculation that Dr. Fowlkes participated in the deliberation and controlled the Committee. Richmond's speculation about Dr. Fowlkes's role and control is insufficient to create a genuine issue of material fact. See Marler, 102 F.3d at 1457 & n.6; O'Bryan v. KTIV Television, 64 F.3d 1188, 1191 (8th Cir. 1995).

Richmond's proffered evidence is also insufficient to create a genuine issue of material fact about Dr. Fowlkes's personal bias. Richmond offers his own conjecture and speculation, which we have already stated is insufficient. Richmond's mother concluded that Dr. Fowlkes was biased, but her opinion is also based only on speculation, not evidence in the record. That Dr. Fowlkes kept a computerized log of his interactions with Richmond does not in itself indicate bias, as Dr. Fowlkes testified that he kept a similar log on other students who had attended meetings with him and their families. Dr. Fowlkes's referral of Richmond's situation to the Scholastic Committee does not indicate bias because his referral was based on the College's usual practices. Richmond also alleges that Dr. Fowlkes's bias can be seen by the fact that Dr. Fowlkes requested that faculty members submit negative non-cognitive evaluations on Richmond, but the record shows only that Dr. Fowlkes received the negative evaluations as they were submitted by faculty members, who are allotted significant discretion in the determination of such measures. In light of this evidence, we cannot conclude that the evidence on the record raises an inference of bias. Indeed, Dr. Fowlkes testified that he tried to give Richmond "a break" after the incident involving the disturbance in his residence hall.

Because Richmond did not raise a genuine issue of material fact regarding his awareness of the faculty's dissatisfaction and the potential for dismissal and whether the College's decision was carefully and deliberately made, the district court properly granted summary judgment on his procedural due process claim.

## B. Substantive Due Process

Whether a student who is subject to academic dismissal may maintain a cause of action for the violation of his right to substantive due process remains an open question. See Regents of the Univ. of Michigan v. Ewing, 474 U.S. 214, 222-23 (1985). We will assume, arguendo, that such a right exists. See, e.g., Disesa, 79 F.3d at 95; Schuler v. University of Minnesota, 788 F.2d 510, 513 n.6, 515 (8th Cir. 1986) (per curiam). To succeed on such a claim, Richmond must demonstrate arbitrary and capricious conduct on the part of the College by showing that there was no rational basis for the College's decision or that dismissal was motivated by bad faith or ill will unrelated to academic performance. See Schuler, 788 F.2d at 515; Horowitz, 435 U.S. at 91-92. "When judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment." Ewing, 474 U.S. at 225. Richmond has failed in this attempt.

Richmond argues that the Scholastic Committee's rejection of his proposed plan and substitution of its own was arbitrary and capricious. The differences to which Richmond points in the two plans are as follows: (1) Richmond's plan called for him to be evaluated by a particular licensed psychologist, while the Scholastic Committee required Richmond to choose a psychologist with whom the members of the committee were familiar; (2) Richmond wanted the ability to complete his rotations anywhere in Arkansas, but to ensure closer monitoring the Scholastic Committee limited Richmond's options in that regard; and (3) Richmond planned to retain the grades and status he had currently attained in his scholarly progression within the College, while the Scholastic Committee required him to re-start his fourth year of study to ensure that he achieved appropriate standards of professionalism. Richmond also contends that the Scholastic Committee's requirement that he accept its plan without change was arbitrary because there was no reason his plan should not have been accepted.

We cannot say that the Scholastic Committee's actions lacked a rational basis. To the contrary, they demonstrate careful deliberation and reflect a carefully considered educational alternative to outright dismissal. See Ewing, 474 U.S. at 227-28 (upholding dismissal that "rested on an academic judgment that is not beyond the pale of reasoned academic decision-making").

## C. Equal Protection

Finally, Richmond argues that the district court erred in granting summary judgment to the College on his equal protection claims. Richmond contends that his constitutional rights were violated because he was treated differently than similarly situated students. Citizens are protected from "arbitrary or irrational state action" by the Equal Protection clause. See Batra v. Board of Regents of the Univ. of Nebraska, 79 F.3d 717, 721 (8th Cir. 1996). As we stated in the due process context, however, Richmond's evidence that the College's conduct was arbitrary or biased against him is insufficient to create a genuine issue of material fact. He has not shown that other students who were similarly situated received different treatment. The College's administrators and faculty testified that they could remember no other student who had received so many negative non-cognitive evaluations.

Finally, because Richmond did not raise his claim of racial bias before the district court, we decline to address it for the first time on appeal. See Bankcard Systems, Inc. v. Miller/Overfelt, Inc., 219 F.3d 770, 772 n.3 (8th Cir. 2000).

The district court's order is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.