# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 20, 2024

Lyle W. Cayce
Clerk

No. 23-40425

Jennifer Sugg,

*Plaintiff—Appellant*,

*versus*

Midwestern University; EmergencHealth P.L.L.C.,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:20-CV-274

Before Smith, Wiener, and Douglas, *Circuit Judges*.

Jacques L. Wiener, Jr., *Circuit Judge*:

Plaintiff-Appellant Jenn Sugg was dismissed from her Certified Registered Nurse Anesthesiology ("CRNA") program after she failed several required courses. She sued Defendants-Appellees Midwestern University and EmergencHealth ("EH") for, *inter alia*, breach of contract and fraud. Sugg appeals the summary judgment in favor of Defendants-Appellees on all causes of action. We AFFIRM.

No. 23-40425

## I. Facts and Proceedings

Midwestern's CRNA program trains registered nurses in anesthesiology. Under the program's guidelines, students must pass all required courses and maintain a cumulative GPA of 2.750 or higher. A course failure in a clinical class results in remediation and repeat of the rotation. Midwestern's student handbook states that "two or more course failures will typically result in dismissal." Further, "[i]f a student passes a repeated course, the original failure remains on the transcript as an 'F' grade and is included in the total number of accumulated failures in the student's academic record."

Sugg enrolled in Midwestern's CRNA program in 2016. In her first semester, she failed Human Anatomy & Embryology and earned a grade point average of only 1.437. Midwestern's Academic Review Committee ("ARC") concluded that Sugg should be placed on an academic leave of absence for the Spring 2017 quarter and retake Anatomy during Summer 2017. Sugg was informed that "additional course failures and/or quarters below the minimum GPA may result in dismissal from the Nurse Anesthesia Program." Sugg was also advised of her opportunity to appeal Midwestern's grading and suspension decisions, but she declined to do so. She retook Anatomy in Summer 2017 and received a "B-minus." Going into the Fall 2017 quarter, Sugg was placed on academic probation because of her low GPA.

In Summer 2018, Sugg participated in her first clinical rotation course ("CR I"). It was held at San Juan Regional Medical Center in Farmington, New Mexico. Sugg was overseen by Midwestern faculty member Brian Estavillo. The daily written evaluations she received were generally positive. However, the Medical Center ultimately asked Midwestern to remove Sugg because of her lack of critical thinking skills, which was putting patient safety

at risk. Midwestern issued Sugg an "F" in CR I. The ARC then unanimously agreed that Sugg should be dismissed pursuant to the program's "two course failures constitutes dismissal" policy. Sugg appealed that decision to Midwestern's Promotion and Graduation Committee, which overturned the dismissal so that she could have a "sufficient opportunity to remediate." That committee assigned Sugg an "in-progress" grade for CR I and arranged for her to retake the course. She was again advised that another course failure or a failure of the program's other "professional requirements" could result in dismissal.

Sugg was assigned to Christus Spohn Shoreline Medical Center in Corpus Christi, Texas to complete CR I and then progress to CR II, the program's second clinical rotation course. EH provides Spohn with CRNAs, who serve as preceptors and evaluate student performance. EH employee Richard Epstein was assigned as Sugg's Spohn-based Clinical Coordinator, and Estavillo remained her Midwestern professor. From her first day, Sugg was identified as a "clinical risk," because of her experience in Farmington. For this reason, Midwestern provided her with a personal remediation plan through which she received additional supervision. At Spohn, Sugg again received numerous positive evaluations, which she turned over to Midwestern as part of the program's clinical requirements. Midwestern thus believed that Sugg was progressing and doing well. This turned out to be false; Sugg simply failed to report her negative evaluations as required.[1]

---

[1] Epstein also testified that Sugg only worked with those who "provided these overblown, exaggerated evaluations so as to make it appear she was doing better than she actually was." "When she worked with the better providers who held her to high standards they were either not handed evaluations, those provided were discarded, [or] she made sure to not work with those providers again."

No. 23-40425

When Midwestern learned of Sugg's negative evaluations in February 2018, Sugg was assigned an "F" in CR II for the following reasons: (1) "failure to submit/report an unsatisfactory clinical evaluation from a preceptor [within] 24 hours," (2) "failure to meet the clinical standards of CR II," and (3) "repeated clinical remediation." Sugg appealed that grade to Dr. Terrance Burrows, Director of the CRNA program at Midwestern, alleging that Epstein had made factual errors in his performance evaluation and was biased against her after a disputed fender-bender in the parking lot. Midwestern disagreed and upheld Sugg's failing grade. The ARC again convened and voted unanimously to dismiss Sugg after her two course failures.[2] Sugg again appealed the ARC's decision, this time unsuccessfully: both the Promotion and Graduation Sub-Committee as well as the Dean of the College of Health Sciences agreed that Sugg should be dismissed. At the time of discharge, her cumulative GPA was 2.742.

Two days after learning of the ARC's dismissal decision, Sugg filed a complaint with Dean of Students Ross Kosinski. She alleged that she was verbally abused and bullied by a CRNA preceptor during her rotation at Spohn. Kosinski investigated Sugg's claims and found them to be without merit, although he did express concern about the manner in which she and others were evaluated for the clinical portion of the program. Because of his apprehension about transparency and the evaluation reporting procedures, Kosinski ultimately recommended that Sugg be allowed to move forward to her next clinical rotation. The ARC did not adopt this recommendation, which was not communicated to Sugg. Sugg also complained to Midwestern

---

[2] Defendants point out that Sugg had technically failed CR I before the Dean overturned her first dismissal, making her failure count three rather than two.

No. 23-40425

about Estavillo's inappropriate behavior with students. Estavillo's nursing license was suspended in 2018 because of a substance-use disorder.

Sugg sued Midwestern and EH for (1) breach of contract, (2) unjust enrichment and quantum meruit, (3) fraud, (4) securing execution of documents by deception, (5) tortious interference with an existing contract, (6) tortious interference with prospective business relations, (7) violations of the Texas Deceptive Trade Practices Act ("DTPA"), and (8) conspiracy. The district court granted both of Defendants' motions for summary judgment in full,[3] and Sugg appealed to this court.

## II. Standard of Review

We review summary judgment de novo. *United States ex rel. Schweizer v. Canon, Inc.*, 9 F.4th 269, 273 (5th Cir. 2021). Summary judgment is proper when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All facts and reasonable inferences are construed in favor of the nonmovant. *Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009).

---

[3] Initially, only Midwestern moved for summary judgment. After witnessing its co-defendant's success, EH then sought the same relief. Based on Sugg's response to EH's motion, which generally argued that Midwestern's summary judgment motion was wrongly decided, Judge Ramos, sua sponte, construed Sugg's briefing as also requesting reconsideration of that decision. Judge Ramos then issued two final orders: (1) granting the construed motion for reconsideration and supplementing her initial order on Midwestern's motion, and (2) granting EH's motion.

No. 23-40425

## III. Discussion

Sugg challenges the district court's resolution of her claims against Midwestern for breach of contract, violation of the DTPA, and fraud, and her claims against EH for tortious interference and fraud. We address each in turn.

A. Claims Against Midwestern

*i. Breach of Contract*

"In Texas, the essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (internal quotation marks and alteration omitted) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C.*, 51 S. W. 3d 345, 351 (Tex. App. 2001)).[4]

The district court found an implied contract between Sugg and Midwestern, in which the university "impliedly agree[d] to provide educational opportunity and confer the appropriate degree in consideration for [Sugg's] agreement to successfully complete degree requirements, abide by university guidelines, and pay tuition." *See Southwell v. Univ. of Incarnate Word*, 974 S. W. 2d 351, 356 (Tex. App. 1998) ("[W]here a private college or university impliedly agrees to provide educational opportunity and confer the appropriate degree in consideration for a student's agreement to successfully complete degree requirements, abide by university guidelines, and pay tuition, a contract exists."). The district court held that Sugg did not perform

---

[4] As a federal court sitting in diversity, we apply the substantive law of the forum state. *Learmonth v. Sears, Roebuck & Co.*, 710 F.3d 249, 258 (5th Cir. 2013).

under that implied contract, which excused Midwestern from any alleged breach. It is undisputed that, at a minimum, Sugg failed both Anatomy and CR II and that her cumulative GPA at the time of her dismissal was 2.742. Under the CRNA program guidelines, "[a] student enrolled in the [program] must pass all courses and maintain a cumulative grade point average of 2.750 or higher to have achieved satisfactory academic progress." Further, "[t]wo or more course failures will typically result in dismissal." The ARC dismissed Sugg on this basis. The district court was thus correct in holding that "Sugg failed to perform under the implied contract by failing two courses."

Sugg does not meaningfully contest this determination—nor could she. Instead, she argues that she should be excused from the consequences of her breach for at least two reasons: (1) frustration of purpose and (2) Midwestern's own breach.

Sugg first asserts that Midwestern frustrated her ability to perform under the contract by dismissing her. She notes that Midwestern's policy for clinical rotation courses is different from that for academic classes, and that a failure of a class like CR II results in repeating the rotation rather than receiving an "F" for purposes of dismissal. Sugg thus believes that Midwestern's decision to dismiss her prevented her from performing under the contract by retaking the course. Midwestern's clinical policies do state that failure in these types of classes should result in repeating the course. Indeed, Sugg benefited from this policy after failing CR I. But this rule cannot hold in perpetuity. If we were to read those guidelines as strictly as Sugg suggests, a student would be able to continue failing and retaking clinical courses forever. Further, as the district court pointed out, the program handbook states that "[i]f a student passes a repeated course, the original failure remains on the transcript as an 'F' grade and is included in the total number of accumulated failures in the student's academic record." Even if

Sugg had been allowed to repeat CR II, her "F" grade (which she appealed and lost) would have remained on her transcript, constituting a second failure warranting dismissal. Finally, Sugg was repeatedly told that an additional course failure, even of a clinical class, would subject her to dismissal. She was subjectively aware of her responsibilities under the contract but did not hold up her end of the bargain.

Sugg further complains that she should be excused from her breach because Midwestern also breached by arbitrarily dismissing her. The district court granted significant deference to Midwestern's academic decision to dismiss Sugg. In *Board of Curators of University of Missouri v. Horowitz*, the Supreme Court noted that "the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." 435 U.S. 78, 90 (1978). For this reason, courts may not override such a determination "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985). The district court ruled that Sugg did not produce sufficient evidence to meet this threshold.

On appeal, Sugg asserts that the district court erred by applying *Horowitz*, which only applies to public institutions because of the unique federalism concerns at play there. But Texas state courts have applied *Horowitz* to private institutions as well, and we are bound by that state's law as a federal court sitting in diversity. *See Learmonth*, 710 F.3d at 258. Although the Texas Supreme Court has not spoken on the issue, "our task is to determine as best we can how that court would rule if the issue were before it." *See F.D.I.C. v. Abraham*, 137 F.3d 264, 268 (5th Cir. 1998). "In so doing, we are *bound* by an intermediate state appellate court decision when we remain unconvinced . . . that the highest court of the state would decide

otherwise." *Id.* (internal quotation marks and citation omitted). At least four different Texas courts of appeals have applied *Horowitz* to private institutions. *See Guinn v. Tex. Christian Univ.*, 818 S. W. 2d 930, 934 (Tex. App.—Fort Worth 1991, writ denied), *Southwell v. Univ. of Incarnate Word*, 974 S. W. 2d 351, 357–58 (Tex. App.—San Antonio 1998, pet. denied), *Todd v. S. Methodist Univ.*, No. 05-21-00702-CV, 2022 WL 16918362, at *6 (Tex. App.—Dallas Nov. 14, 2022, no writ), *Ogunbase v. Baylor Coll. of Med.*, No. C14-88-00285-CV, 1989 WL 119591, at *3 (Tex. App.—Houston [14th Dist.] Oct 12, 1989, no writ). Without any evidence that the Texas Supreme Court would hold otherwise, we must act in accordance with these unanimous intermediate state courts and apply *Horowitz* to the case at hand.

*Horowitz* mandates deference to academic decisions. 435 U.S. at 92. And contrary to Sugg's arguments, Midwestern's decision to dismiss her was academic in nature. She was repeatedly told that she was being dismissed for failing two classes, an indisputably academic issue. Further, the program catalog distinguishes between "academic dismissal," which is governed by the ARC and the Promotion and Graduation Committee, and "disciplinary dismissal," overseen by the Dean of Students. Sugg's ultimate dismissal from Midwestern directly adhered to the procedures laid out in the catalog for academic dismissal.

It is true that Sugg engaged in some disciplinary infractions in addition to her academic failures. For example, one of the reasons for which she received a failing grade in CR II was her "[f]ailure to submit/report an unsatisfactory clinical evaluation." The program materials state that "[f]ailure to comply with submission of all required documents will be addressed as unprofessional conduct which may result in disciplinary action." More broadly, Sugg contends that the "reasoning" behind her failure of CR II were actions that were disciplinary in nature. For example, the program handbook does describe neglect of duties and endangering

patient safety as grounds for disciplinary action. Just because such actions are *also* grounds for discipline, however, does not mean that they are not requirements for passing the course, which is an academic outcome. Courts often consider this distinction in evaluating the performance of a student in the clinical phase of healthcare education. *See, e.g.*, *Ewing*, 474 U.S. at 227 n.13, 228 n.14 (holding that the decision to dismiss a medical resident based on, *inter alia*, lack of judgment and an inability to set priorities, was academic). Further, the fact that Sugg committed *some* disciplinary misconduct is insufficient to support a jury question on academic dismissal. Instead, at this point in the litigation, she would have to show that she was "dismissed *solely* for behavioral misconduct." *Shaboon v. Duncan*, 252 F.3d 722, 731 (5th Cir. 2001) (emphasis added).

The district court did not err in holding that Midwestern's decision to dismiss Sugg from the program was academic rather than disciplinary. We are thus bound by Texas's application of *Horowitz,* which mandates that when judges are asked to review a "genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment." *Ewing*, 474 U.S. at 225. Midwestern met its burden in establishing that it did not breach the contract as a matter of law, because its decision to fail and then dismiss Sugg was not arbitrary but instead an exercise of professional judgment. *See Guinn*, 818 S. W. 2d at 932. The decision to fail Sugg in CR II was based on documented, serious inadequacies in her academic performance. Sugg argues that the decision was not supported by "valid, reliable data and information from evaluations, viewed objectively and fairly," as required by Midwestern's policies, because it did not give sufficient weight to all of the positive evaluations that she received.[5] Her

---

[5] Sugg also alleges that Midwestern "actively sought the creation of *post-hoc* evidence to support its decisions" to fail her. She cites to an email of March 19, 2019, sent

grade, however, took into account multiple negative evaluations, discussions among several stakeholders, as well as her failure to comply with reporting policies. Midwestern's actions might not have been perfect, but our standard of review requires deference to a university's decision-making. As the district court pointed out, "[t]o say that there was a fact question regarding Sugg's academic performance that Midwestern resolved against her does not make the decision any less careful or deliberate or outside the purview of the courts."

The strong procedural safeguards which were in place are further evidence that Midwestern's decision was careful and deliberate. Midwestern followed its guidelines to a "T." Specifically, Sugg was given an opportunity to be heard and to appeal each decision. This process led, in one instance, to her being given a second chance to pass a course. It was not a "substantial departure from accepted academic norms" to fail Sugg in this context. *See Ewing*, 474 U.S. at 225. If this court were to wade further than that into substantive disagreements with grades, we would contravene *Horowitz* and its rule of judicial deference. *See Horowitz*, 435 U.S. at 96 n.6 (Powell, J., concurring) ("University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation.").

In sum: (1) there existed an implied contract between Sugg and Midwestern; (2) Sugg did not uphold her end of the bargain, since she failed

---

by Burrows, which stated that "Jenn Sugg is emphasizing all the positive evaluations that she received so if any other of your staff want to email me regarding their experiences with Jenn that would be helpful." Sugg says that this is evidence of Midwestern's failing to support its decision with "valid, reliable data." No so: That request was made to better understand Sugg's performance during her appeals process, especially once it became clear that she might not have been reporting all of her evaluations. The decision to fail her had already been made.

to complete degree requirements by failing two courses; and (3) under the required *Horowitz* standard of deference, Midwestern did not breach the agreement. The district court's summary judgment in favor of Midwestern on Sugg's breach of contract claim was not made in error.

### ii. DTPA

"A claim under the DTPA has three elements: '(1) the plaintiff is a consumer, (2) the defendant engaged in false, misleading, or deceptive acts, and (3) these acts constituted a producing cause of the consumer's damages.'" *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 768 (5th Cir. 2016) (quoting *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S. W. 2d 472, 478 (Tex. 1995)). Sugg claims that Midwestern falsely represented that it (1) evaluated students based on "valid, reliable data and information, viewed objectively and fairly," while instead relying on a biased view of selective evaluations for Sugg's grade; (2) assigned additional clinical supervision whenever student progress was "deemed unsatisfactory," while instead dismissing Sugg without giving her an opportunity for additional supervision; and (3) provided "qualified and dedicated faculty," while instead knowingly employing a biased and unfit Estavillo.

Sugg's first allegation—that Midwestern falsely represented that it evaluated students fairly, while instead using biased evaluations for her CR II grade—relates to Midwestern's academic decision to dismiss her from the program, so the *Horowitz* analysis above precludes the claim, "regardless of how it is cast in terms of liability theories." Sugg's second claim is that Midwestern violated its own program manual by failing to assign her additional supervision when it identified that she was struggling. But Midwestern complied with this policy. Sugg was given additional supervision at Farmington during her first attempt at CR I. When she arrived at Spohn, she was automatically placed on a remediation plan that required her to turn

in daily care plans and evaluations. The only reason that she was not given additional supervision later in CR II was because she herself was falsely representing her progress. Both claims of "deception" on the part of Midwestern are without merit.

Sugg's third DTPA claim, regarding misrepresentations about the quality of Midwestern's faculty, fares only slightly better. Midwestern represented in its program materials that its faculty was qualified and dedicated, and Sugg allegedly relied on these materials in choosing to attend Midwestern. But Estavillo's nursing license was suspended for diverting and using hospital narcotics. He had also been accused of abusive and sexual misconduct. The district court therefore held that "Sugg ha[d] arguably supplied some evidence to support a jury question" on whether Midwestern's representations about the quality of their faculty were knowingly false. However, the court held that the evidence did not support a finding that Midwestern's misrepresentations about its faculty were a producing cause of Sugg's alleged damages. We agree.

On appeal, Sugg maintains that she "provided more than sufficient evidence of the economic damages she suffered." But that is not the relevant question, which is instead whether those damages were a result of Midwestern's misrepresentations about the quality of its faculty. Sugg further contends that there is "at least a triable question as to whether, if Midwestern had employed the qualified and dedicated faculty it claimed to have instead of Estavillo, Sugg would have still received the failing grade that precipitated her dismissal and the underlying lawsuit." Causation under the DTPA "requires proof that the act was a substantial factor in bringing about the injury, without which the injury would not have occurred." *Metro Allied Ins. Agency, Inc. v. Lin*, 304 S. W. 3d 830, 834 (Tex. 2009). Sugg has not identified any evidence to suggest that she would not have been dismissed if she had had a different professor. Estavillo was not one of Sugg's preceptors

and he did not evaluate her in any way. Estavillo did not assign her the failing grade in Anatomy. He was not on the ARC. Three levels of review at Midwestern affirmed Sugg's dismissal. Accordingly, the district court did not err in dismissing Sugg's DTPA claims, either because Midwestern did not act "deceptively" or because there was no evidence that the alleged misrepresentation caused Sugg's damages.

### iii. Fraud

Sugg asserts that Midwestern's misrepresentations also support a claim for common law fraud. In Texas, fraud requires "(1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury." *Anderson v. Durant*, 550 S. W. 3d 605, 614 (Tex. 2018). As explained above, Midwestern made no fraudulent misrepresentations that caused Sugg's alleged injuries. This is true no matter how the claim is cast.

Within the fraud context, Sugg also complains of "partial disclosures" made by Midwestern. After Midwestern investigated Sugg's claims of harassment, it disclosed only that it was "difficult to positively verify that [she was] treated poorly," but failed to share that it had found evidence of others making sexist comments and that Kosinski had recommended that she be reinstated into the program. Sugg argues that this was a "partial disclosure that created a false impression." *See Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, L.L.C.*, 572 S. W. 3d 213, 220 (Tex. 2019). Midwestern counters that "[a]bsent any fiduciary duty, [Sugg] fails to provide any justification for her position that Midwestern had a duty to disclose the full contents of the internal report." This is incorrect. It is the partial disclosure itself that creates the duty. *See Union Pac. Res. Grp., Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 584 (5th Cir. 2001) (noting that Texas law

is clear that "one who voluntarily elects to make a partial disclosure is deemed to have assumed a duty to tell the whole truth, i.e., to make full disclosure, even though the speaker was under no duty to make the partial disclosure in the first place."). However, Sugg's claim again fails on the issue of causation. Had she had the full picture, Sugg says, she could have appealed her dismissal to Midwestern's president. But she presented no evidence to suggest that the full report was "necessary or sufficient" to present and win such an appeal. In fact, the Dean received the full report, but still decided to uphold the dismissal recommendations. Because Sugg has not shown that she was injured by justifiably relying on the partial disclosure, Midwestern's actions cannot support her claim for fraud. *See Bombardier*, 572 S. W. 3d at 219.

### B. Claims Against EH

Sugg also appeals the district court's judgment in favor of EH on her tortious interference and fraud claims.

"Under Texas law, the elements of tortious interference with a contract are: (1) the existence of a contract, (2) willful and intentional interference, (3) interference that proximately cause damages, and (4) actual damage or loss." *Alviar v. Lillard*, 854 F.3d 286, 289 (5th Cir. 2017) (citation omitted). Sugg asserts that EH interfered with her implied contract with Midwestern by intentionally seeking to "have Midwestern disregard Sugg's positive evaluations." Once again, this is merely an attempt to lure us into the murky waters of reviewing academic decisions. Sugg fails to offer any evidence to show that Midwestern's decision to fail and dismiss her—relying on EH evaluations—was not "careful and deliberate." *See Horowitz*, 435 U.S. at 85. Additionally, as the district court found, EH was obligated under *its* contract with Midwestern to evaluate Sugg. "Its fulfillment of that duty does not constitute interference with Sugg's contract." EH could not have

acted with the intention of interfering with the Midwestern/Sugg contract when its actions were nothing more than what it was required to do under its own Midwestern/EH contract. *See S.W. Bell Tel. v. John Carlo Tex. Inc.*, 843 S. W. 2d 470, 472 (Tex. 1992) (holding that a party's actions do not interfere with a contract when they are a mere exercise of the party's own rights). Finally, it is clear that Sugg failed to perform under her implied contract with Midwestern. Thus, any alleged interference by EH would not be the proximate cause of her damages.

As to her fraud claim, Sugg contends that Epstein, her EH preceptor, fraudulently represented to her when she first arrived that she could choose to work with any preceptors, but then held her choices against her by accusing her of working only with those she knew would give her positive evaluations. However, Epstein's representation that Sugg could choose with whom to work was not a false representation—that was the rule, and that rule was applied to Sugg. Without a false or misleading statement, a claim of fraud cannot stand. *Tukua Invests., LLC v. Spenst*, 413 S. W. 3d 786, 798–800 (Tex. App. 2013). Sugg maintains that EH's discrediting of her positive evaluations "on the basis of her selection of preceptors" was a substantial factor in Midwestern's decision to fail Sugg. But again, the school's academic decision to fail her was not substantially arbitrary or a departure from professional norms. Neither has Sugg has shown how EH's alleged fraud caused her injuries. The district court thus did not err in granting summary judgment in favor of EH.

## IV. Conclusion

For the reasons detailed above, the district court's decision is AFFIRMED in full.